KOPPERS COMPANY, INC. Plaintiff,

v.

AMERICAN EXPRESS COMPANY, a corporation, Shearson Lehman Brothers Holdings, Inc., a corporation, Shearson Lehman Hutton, Inc., a corporation, SL–Merger, Inc., a corporation, BNS Partners, partnership, BNS Inc., a corporation, Bright Aggregates Inc., a corporation, Beazer PLC, a public limited company, and National Westminster Bank PLC, an English banking company, Defendants.

Civ. A. No. 88–557.

United States District Court,
W.D. Pennsylvania.

April 15, 1988.

Joseph A. Katarincic, David Borkovic, Kirkpatrick & Lockhart, Edward B. Wood, Koppers Co. Law Dept., Pittsburgh, Pa., for plaintiff Koppers, Co., Inc.

William M. Wycoff, Ralph Scalera, Thorp, Reed & Armstrong, Pittsburgh, Pa., for defendants BNS Partners, BNS, Inc., Bright Aggregates, Inc., and Beazer, PLC.

James D. Morton, Stanley Yorsz, Buchanan Ingersoll P.C., Pittsburgh, Pa., Stephen Greiner, Willkie, Farr & Gallagher, New York City, for defendants American Exp. Co., Shearson Lehman Bros. Holdings, Inc., Shearson Lehman Hutton, Inc., and SL–Merger, Inc.

## TABLE OF CONTENTS

INTRODUCTION ......................................................... 1375
I. THE PARTIES—THE TENDER OFFER—THE BACKGROUND ........ 1376
 A. *Plaintiff* ...................................................... 1376
 B. *The Shearson Interests* ......................................... 1376
 C. *The Beazer Interests* ........................................... 1376
 D. *The NatWest Interests* ......................................... 1377
 E. *The Acquisition Vehicles* ....................................... 1377
 F. *Transactions in Target Stock Prior to March 3, 1988* ............ 1377
 G. *The Tender Offer and Koppers' Response* ....................... 1378
 H. *Other Litigation* ............................................... 1379
 1. The Delaware Action ........................................ 1379
 2. The California Action ........................................ 1379
II. CLAIMS PRESENTED IN THIS ACTION ............................ 1380
 A. *Plaintiff's Complaint* ........................................... 1380
 B. *Counterclaim Brought by BNS Inc., BNS Partners, Bright Aggregates, and Beazer* ........................................... 1381
 C. *The Law of Preliminary Injunctions* ............................ 1381

 D. *The Williams Act* ........................................... 1382
III. FINANCIAL INTERESTS OF BRIGHT AGGREGATES, SL–MERGER, SPEEDWARD, AND THEIR PARENT COMPANIES ................ 1384
 A. *BNS Partners* ........................................... 1384
 B. *BNS Inc.* ............................................... 1385
 1. Allocation of Common Shares, Voting Rights, and Other Rights 1385
 2. Bright Aggregates' Capital Contribution ................. 1385
 3. Shearson Holdings' Capital Contribution ................. 1386
 4. Bank Financing ........................................ 1386
 5. Call and Put Options .................................. 1387
 6. Summary ............................................. 1387
IV. DISCLOSURE OF INFORMATION REGARDING THE SHEARSON ENTITIES ................................................... 1387
 A. *Shearson as a Bidder* .................................. 1387
 B. *The Williams Act Vis-a-Vis Shearson* .................... 1390
 1. Shearson and Schedule 14D–1—Item 10(b) ............... 1391
 C. *Analogous Rules and Regulations* ....................... 1391
 D. *Shearson Must Disclose Financial Information* ........... 1392
V. DISCLOSURE OF PLANS TO REPAY FINANCIAL OBLIGATIONS AND CONTRIBUTIONS ....................................... 1393
 A. *Plans Described in the Tender Offer* .................... 1393
 B. *Incomplete Relevations Regarding the Sale of Assets* ........... 1394
VI. DISCLOSURE OF ALLEGED VIOLATIONS OF THE MARGIN REQUIREMENTS ........................................... 1395
 A. *Standing of the Plaintiff* ............................... 1397
 B. *Bank Syndicate Borrowings* ............................. 1397
 C. *Shearson Holdings and the Margin Requirements* ............... 1398
 1. Applicable Margin Regulations ......................... 1398
 2. The Notes ............................................ 1399
 3. The Series B Preferred Stock .......................... 1402
VII. DISCLOSURE OF ALLEGED VIOLATIONS OF THE BANK HOLDING COMPANY ACT ........................................... 1403
VIII. DISCLOSURE OF ALLEGEDLY UNTIMELY HART–SCOTT–RODINO NOTIFICATION VIOLATIONS .................................. 1404
IX. DISCLOSURE OF INFORMATION REGARDING KOPPERS' ENVIRONMENTAL LIABILITIES ........................................ 1405
 A. *The Arguments of the Commonwealth of Pennsylvania and the Governor of Pennsylvania as Amici Curiae* .................... 1405
 B. *The Arguments of Koppers* .............................. 1406
X. DEFENDANTS' COUNTERCLAIMS ALLEGING VIOLATIONS OF THE WILLIAMS ACT BY PLAINTIFF ................................ 1406
XI. CONCLUSION ............................................... 1407

## OPINION AND ORDER ON CROSS–MOTIONS FOR PRELIMINARY INJUNCTION

COHILL, Chief Judge.

Presently before the Court are cross-motions for preliminary injunctions. The plaintiff, Koppers Company, Inc. ("Koppers") brought this action to enjoin a hostile tender offer attempt commenced by defendant BNS, Inc. on March 3, 1988. In its request for a preliminary injunction, Koppers argues that there is a great likelihood that the tender offer violates federal securities and other laws and that irreparable harm will be caused its shareholders if the offer is not enjoined. Defendant BNS, Inc. requests a preliminary injunction ordering Koppers to correct allegedly misleading statements in its Schedule 14D–9 statement, a statement which is required to be filed with the Securities and Exchange Commission ("SEC") by a target company which is the subject of a tender offer. 15 U.S.C. § 78n(d)(4).

## INTRODUCTION

This is a difficult case. The facts are intricate and complicated; the law is fuzzy. Because of the unusual posture of the American Express/Shearson interests, apparently as broker-dealer-investment bank-

er-advisor-owner in this takeover transaction, we have had to find the way by looking at cases, statutes and regulations which merely give us clues as to the direction the court should take. We have found little to serve as an actual roadmap.

The facts are similarly muddled because of the intricate arrangements of the tender offerors. This is demonstrated by the fact that more than the first one-third of this document is devoted to a description of those arrangements.

The polestar for us, therefore, has been what we perceive to be the purpose and intent of Congress as reflected in the various securities laws and related statutes, regulations and cases interpreting them. Their overriding purpose was perhaps best-stated recently by Harvard Professor, Louis Loss:

> As the Supreme Court has since [1933] put it, the SEC statutes embrace a "fundamental purpose * * * to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." In short, Congress did not take away from the citizen "his inalienable right to make a fool of himself." It simply attempted to prevent others from making a fool of him.

L. Loss, *Fundamentals of Securities Regulation* 32–33 (2nd ed. 1988).

With this philosophy and clear legislative intent in mind, we have analyzed the facts of this case and concluded that it is more prudent to err on the side of disclosure than obfuscation.

After consideration of the documents filed with the SEC, the briefs filed by the parties, and the arguments of the parties and other evidence of record provided to us at a hearing held April 4, 5, and 6, 1988, we now make the following findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

## I. THE PARTIES—THE TENDER OFFER—THE BACKGROUND

### A. *Plaintiff*

Plaintiff, Koppers Company, Inc. ("Koppers") is a corporation organized under the laws of the State of Delaware with its principal place of business in Pittsburgh, Pennsylvania. Koppers' common and preferred stocks are registered pursuant to section 12(g) of the Securities Exchange Act of 1934, 15 U.S.C. § 78g, and are listed and traded on the New York, Midwest and Pacific Stock Exchanges. Koppers has two divisions: (1) Construction Materials and Services, and (2) Chemical and Allied Products.

### B. *The Shearson Interests*

Defendant American Express Company ("American Express") is a corporation organized under the laws of the State of New York and has its principal place of business in New York City.

Defendant Shearson Lehman Brothers Holdings, Inc. ("Shearson Holdings") is a corporation organized under the laws of the State of Delaware and has its principal place of business in New York City. American Express owns over 60% of the equity interest in Shearson Holdings.

Defendant Shearson Lehman Hutton, Inc. ("Shearson Lehman") is a corporation organized under the laws of the State of Delaware with its principal place of business in New York City. Shearson Lehman is a wholly owned subsidiary of Shearson Holdings.

Defendant SL–Merger, Inc. ("SL–Merger") is a corporation organized under the laws of the State of Delaware and has its principal place of business in New York City. SL–Merger is a wholly owned subsidiary of Shearson Lehman and an indirect subsidiary of Shearson Holdings. SL–Merger has engaged in no activities other than those incident to its organization and the tender offer.

### C. *The Beazer Interests*

Defendant Beazer PLC ("Beazer") is an English public limited company with its principal place of business at Beazer House, Lower Bristol Road, Bath, Avon BA2 3EY, United Kingdom.

Defendant Bright Aggregates Inc. ("Bright Aggregates") is a corporation organized under the laws of the State of

Delaware with its principal place of business in Dallas, Texas. Bright Aggregates is a wholly-owned indirect subsidiary of Beazer. Brian Beazer is Chairman and Chief Executive of Beazer and President and Director of Bright Aggregates.

### D. *The NatWest Interests*

Defendant National Westminster Bank PLC ("NatWest") is an English banking company that is registered in the United States under the Bank Holding Company of 1956, 12 U.S.C. § 1841.

Speedward Limited ("Speedward") is a company organized under the laws of the United Kingdom and is a wholly-owned direct subsidiary of NatWest Investment Bank Limited ("NatWest Limited"), also an English company. NatWest Limited is a wholly-owned subsidiary (and the investment banking arm of) NatWest.

Cutting through the maze of the corporations, partnerships and the individual just described, these defendants represent three interests united in attempting to take over Koppers—Beazer, Shearson and NatWest.

### E. *The Acquisition Vehicles*

On October 16, 1987, Beazer, NatWest, and Shearson Holdings formed BNS Partners under the Delaware Uniform Partnership Act. The partnership consisted of Bright Aggregates, Speedward, and SL–Merger each of which jointly contributed $50 million in capital.

Beazer, through Bright Aggregates, has contributed $24.5 million in capital and received a 49% interest in the partnership; Shearson, through SL–Merger, contributed $23.05 million and received a 46.1% interest in the partnership; and NatWest, through Speedward, contributed $2.45 million and obtained a 4.9% interest. The sole purpose of the partnership was to acquire shares of Koppers prior to the tender offer, which was not made until March 3, 1988. Bright Aggregates, with Mr. Beazer as its President, is the managing partner of BNS Partners and has sole authority to manage the partnership's affairs.

Defendant BNS, Inc. ("BNS Inc.") is a corporation organized under the laws of the State of Delaware and has its principal place of business in Dallas, Texas. The shareholders of BNS Inc. are Bright Aggregates, Speedward, and SL–Merger. These three shareholders own stock in BNS Inc. in apparent direct proportion to the capital contributions of their progenitors; the relationship is somewhat obscured, however, by the fact that each of the three owns a fraction of one share of a different class of stock, with the three holdings coming to a total of one share.

Thus, Bright Aggregates owns .490 shares of Class A common stock, which is all the Class A common stock outstanding; SL–Merger holds .461 shares of Class B common stock; Speedward holds .024 shares of Class B common stock and .025 shares of Class C common stock. We will discuss this unusual arrangement later.

BNS Inc. was formed for the sole purpose of acquiring the shares of Koppers from the tender offer.

### F. *Transactions in Target Stock Prior to March 3, 1988*

Bright Aggregates began purchasing Koppers' stock through Shearson prior to the tender offer. As of October 21, 1987, Bright Aggregates had accumulated 343,-400 common shares of Koppers stock. Bright Aggregates now owns 458,100 shares of common stock which it purchased in the open market.

Between October, 1987, and March 3, 1988, BNS Partners used its $50 million in capital and an additional $21 million in margin loans to purchase 1,636,000 shares of Koppers stock in the open market through its broker, Shearson Lehman. In order to comply with the stock purchasing notification requirements of the Hart–Scott–Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a(a), BNS Inc. filed their Hart–Scott–Rodino Notification and Report forms with the SEC on March 3, 1988, the same day it commenced its tender offer. The timing of the purchases relative to the infusion of capital was called into question at the hearing.

### G. *The Tender Offer and Koppers' Response*

On March 3, 1988, BNS Inc., Bright Aggregates, and Beazer each filed a Schedule 14D–1 with the Securities and Exchange Commission ("SEC"), as required by 15 U.S.C. § 78n(d)(1), and commenced an unsolicited tender offer for Koppers' common stock at a price of $45.00 per share and its cumulative preferred stock 4% series at a price of $107.75 per share. The stated purpose of the tender offer is to acquire all the stock of Koppers and to seek to have Koppers consummate a merger or similar business combination transaction with BNS Inc., or an affiliate of BNS Inc. The tender offeror was identified as BNS Inc. There have since been at least 20 amendments to the original Schedule 14D–1.

No entity identified with the Shearson interests—SL–Merger, Shearson Lehman, American Express, or Shearson Holdings—filed a Schedule 14D–1 relating to the tender offer. In addition to its part ownership of BNS Inc. through SL–Merger, Shearson is the financial advisor for BNS Inc. and one of the dealer-managers for the tender offer.

To complete the tender offer, the BNS Inc. tender offer statement reveals that financing of approximately $1.7 billion is needed. Shearson is to provide approximately $570 million; a syndicate of banks led by Citibank is to lend approximately $864 million, and Beazer is to contribute $298 million for preferred stock issued by BNS Inc. and the 458,100 common shares of Koppers that it holds. Beazer's contribution is largely financed by NatWest. The financial arrangements are discussed more fully at Part III of this Opinion.

Upon completion of the tender offer, BNS Partners will transfer its shares of Koppers to BNS Inc.; the partnership will be dissolved, and BNS Inc. will assume the liabilities and obligations of BNS Partners. BNS Inc., will, in turn, issue common shares to be distributed among the partners of BNS Partners, so that immediately after the distribution Bright Aggregates will hold 490 shares of Class A Common Stock, SL–Merger will hold 461 shares of Class B Common Stock, and Speedward will hold 24 shares of Class B Common Stock and 25 shares of Class C Common Stock.

The stated purpose of the tender offer is to acquire control of Koppers through the purchase of common and preferred shares of Koppers. The tender offer states in part:

> as soon as practicable following completion of the Offer, to seek maximum representation on the Company's [Koppers'] Board of Directors and to propose the Merger, pursuant to which each outstanding Common Share (other than Shares held by the Purchaser [BNS, Inc.], the Partnership [BNS Partners] or Bright [Bright Aggregates], Shares held in the treasury of the Company and Shares held by stockholders who properly perfect appraisal rights under Delaware law) would be converted into the right to receive an amount in cash equal to the price per Share paid pursuant to the Offer. Prior to consummating the Merger, the Purchaser intends to cause the Company to redeem all Preferred Shares not purchased pursuant to the Offer for $107.75 per Preferred Share (plus accrued and unpaid dividends) or, in the case of a Short–Form Merger ..., to cause each Preferred Share ... to be converted in the Short–Form Merger into the right to receive such amount.

Tender Offer, at 29.

> The exact timing and details of the Merger will depend upon a variety of factors and legal requirements and the number of Shares acquired by the Purchaser pursuant to the Offer.... Although it is the Purchaser's intention ... to propose and seek to consummate the Merger, the Purchaser can give no assurance that the Merger will be consummated or as to the timing of the Merger.

Tender Offer, at 35.

On March 16, 1988, the Koppers Board of Directors ("The Board") declared the $45 per share offer of March 3 to be inadequate. The Board did conclude, however, that the offer price of $107.75 for the preferred stock was adequate. As required by

15 U.S.C. § 78n(d)(4), Koppers filed a Schedule 14D–9 with the SEC.

On March 21, 1988, defendants increased their tender offer proposal to $56 per share of common stock. On March 22, 1988, the Board declared the $56 per share offer to be inadequate.

On March 25, 1988, the defendants increased their offer to $60 per share of common stock. On April 5, 1988, The Board met to consider the $60 offer, and announced that it was unable to take a position as to the adequacy of the offer, although Mr. Charles Pullin, Chairman and Chief Executive Officer of Koppers, indicated in his testimony at the hearing before this court that he feels the offer is inadequate.

The original offer of $107.75 per share of preferred stock has not been modified.

The tender offer is scheduled to expire April 15, 1988.

### H. *Other Litigation*

There are two actions related to this tender offer proceeding in the United States District Courts in the District of Delaware and in the Central District of California. There have been significant rulings in each of those courts which put our case in an almost contingent posture. *See* this Court's Temporary Restraining Order of April 6, 1988. Nevertheless, counsel indicated during our preliminary injunction hearing that they wish to pursue their respective requests for preliminary injunctions, and we see no reason to delay our consideration of the matters before us.

### 1. The Delaware Action

The laws of State of Delaware have an important presence in this case. Among other conditions, the tender offer was predicated on:

> (3) the purchaser being satisfied that the restrictions on business combinations contained in section 203 of the Delaware General Corporation Law are invalid, unenforceable, or otherwise inapplicable to the proposed merger (as a result of board action, the tender of a sufficient number of shares, court action or otherwise); (4) the purchaser being satisfied

that the proposed merger can be consummated without the need for a supermajority vote of the company stockholders pursuant to Article Eighth of the company's certificate of incorporation (as a result of board action, the tender of a sufficient number of shares, or otherwise).

Tender Offer, at 1.

Accordingly, on March 3, 1988, the same day it commenced the tender offer, defendant BNS Inc. filed an action against Koppers, and its individual directors, the Attorney General and the Secretary of State of the State of Delaware in the United States District Court for the District of Delaware, docketed at Civil Action No. 88–130. BNS Inc. sought a declaratory judgment that the Delaware takeover statute is unconstitutional, and a preliminary injunction preventing the activation of the rights ("poison pill") plan previously adopted by Koppers' board of directors.

On April 1, 1988, the Delaware court filed an opinion holding that the Delaware statute is most likely not unconstitutional and that Koppers' rights plan most probably will not immediately irreparably injure BNS Inc., and denying BNS Inc.'s motion for a preliminary injunction.

Pursuant to the Delaware statute, the validity of which the court upheld, the defendants must obtain 85% of the voting stock of Koppers in order to avoid the restrictions of that statute. In such event, the rights plan of Koppers would also be inapplicable because its 80% supermajority requirement would be satisfied. The only other manner in which the tender offer's conditions can be satisfied is by action of Koppers' board of directors.

### 2. The California Action

The Beazer interests have an aggregate construction materials business in California, which competes with a plant owned by Koppers in California. The United States District Court for the Central District of California issued a preliminary injunction on April 4, 1988, indefinitely enjoining the tender offer on antitrust grounds. Although the Ninth Circuit Court of Appeals

has agreed to hear BNS Inc.'s appeal on an expedited basis the week of May 9, 1988, the preliminary injunction is still in effect.

## II. CLAIMS PRESENTED IN THIS ACTION

### A. *Plaintiff's Complaint*

At the outset, we note that this Court has jurisdiction pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. (the "Exchange Act") and 28 U.S.C. §§ 1331 & 1337. Furthermore, venue is proper in the Western District of Pennsylvania pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391.

On March 11, 1988, Koppers filed this action, alleging that the defendants had committed various violations of the Williams Act, 15 U.S.C. § 78n(d)(1) & (e), in connection with the tender offer. The same day, defendants BNS Partners, BNS Inc., Bright Aggregates, and Beazer PLC filed a Motion to Transfer the Koppers' action to the United States District Court for the District of Delaware on the grounds (1) that venue more properly lies in Delaware for the convenience of the parties and witnesses, and in the interests of justice, pursuant to 28 U.S.C. § 1404(a); and (2) that this action belongs in the Delaware court as a compulsory counterclaim to the Delaware action, *see* Fed.R.Civ.P. 13. In my absence, Judge Diamond of this court heard arguments on an expedited basis, and denied the motion to transfer pursuant to section 1404(a). On March 17, 1988, after hearing additional arguments, I issued an Opinion and Order denying the defendant's Motion to Transfer, holding that the action filed in the Western District of Pennsylvania is not a compulsory counterclaim to the issues presented in the Delaware action.

Koppers alleges that the defendants are soliciting tenders of Koppers' stock through a materially false and misleading Offer to Purchase that fails to disclose information required by the Securities Exchange Act of 1934.

Count 1 of Koppers' Amended Complaint alleges that the defendants violated Sections 14(d) and 14(e) of the Williams Act, 15 U.S.C. § 78n(d) and (e), and the rules and regulations of the Securities Exchange Commission by (1) failing to provide adequate information regarding the role of the Shearson entities; (2) failing to disclose that a subsidiary of Shearson, E.F. Hutton & Company, Inc., has pled guilty to certain criminal charges and that certain of its former employees face legal actions and SEC investigations; (3) failure to file financial information with respect to "bidders" Shearson Lehman and NatWest; (4) failure to file other material information concerning the bidders; and (5) failure to state which jurisdictions are encompassed in a disclaimer that tenders will not be accepted from jurisdictions in which the making of the offer would not be in compliance with state securities laws.

Count 2 alleges that the Schedule 14D-1 fails to disclose (1) the conditional and speculative nature of the financing; (2) that the terms of the financing would violate Section 7 of the Exchange Act; (3) that Shearson purchased and sold Koppers' securities between the date on which BNS Partners was formed and the date the tender offer commenced; (4) that Shearson Lehman contacted Koppers in February, 1988, and offered to assist Koppers in any defense of a tender offer; and (5) that significant criminal, civil, and administrative investigations have been undertaken.

Count 3 alleges that the Schedule 14D-1 fails to disclose that the transaction contemplated by the tender offer violates Section 7 of the Exchange Act, 15 U.S.C. § 78g, and Federal Reserve Board Regulations G, T, U, and X, 12 C.F.R. §§ 207, 220, 221, and 224, in that the banks and broker-dealers involved in this transaction are prohibited from lending more than 50% of the funds used to purchase stock if such stock is to be used to secure a loan. It is further alleged that BNS Inc. is a shell corporation that will incur debt as a result of the tender offer which will exceed the 50% limitation.

Count 4 alleges that the Schedule 14D-1 fails to disclose that the transaction contemplated by the tender offer violates Section 4(a)(1) of the Bank Company Holding

Act, 12 U.S.C. § 1843(a)(1), which prohibits a bank holding company from acquiring "direct or indirect ownership or control of any voting shares of a company which is not a bank," in that NatWest is a bank holding company which will acquire 4.9% indirect ownership of Koppers' stock if the tender offer is successful.

On the basis of these four counts, Koppers seeks a preliminary and permanent injunction against the defendants' solicitation and/or purchase of Koppers' stock by means of the tender offer, an order requiring correction of false and misleading statements, an order prohibiting future false and misleading statements, damages, and other just and proper relief.

Count 5 alleges that Shearson Holdings and/or Shearson Lehman violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and the rules and regulations promulgated thereunder by executing transactions in Koppers' stock from October 17, 1987, through March 2, 1988, during which period Koppers repurchased 476,000 shares of its stock. Koppers alleges that the stock price was artificially inflated and manipulated during that period and seeks a judgment for all damages it sustained as a result of Shearson Holdings' and/or Shearson Lehman's actions.

In its Second Amended Complaint, Koppers added Count 6, alleging that defendants violated the Williams Act by failing to disclose that BNS Inc. had violated the Hart–Scott–Rodino Antitrust Improvements Act, 15 U.S.C. 18a(a) & (d) by its transaction in Koppers stock prior to commencement of the tender offer. The relief requested for Count 6 is the same as that requested for Counts 1 through 4.

On March 25, 1988, defendants BNS Partners, BNS Inc., Bright Aggregates, and Beazer, filed an answer and counterclaim setting forth affirmative defenses challenging the good faith of Koppers' responses to the tender offer and charging that the Schedule 14D–9 filed by Koppers violated the Williams Act in several respects.

### B. Counterclaim Brought by BNS, Inc., BNS Partners, Bright Aggregates and Beazer

BNS Inc., BNS Partners, Bright Aggregates, and Beazer PLC have filed a counterclaim alleging that the Schedule 14D–9 filed by Koppers in response to the tender offer is materially false and misleading and is therefore in violation of the Williams Act, in that Koppers has failed to disclose material information about: (1) its rejection of the original tender offer price of $45 a share; (2) the terms of Koppers' suggested plan of recapitalization and proposed substantial cash dividend or distribution; (3) the terms for financing Koppers' suggested plan of recapitalization; (4) the sale of Koppers' stock to its employee stock ownership plan; (5) the potential sale of all or part of Koppers' construction materials and service business; (6) the effect of Koppers' proposed plans on the price of Koppers' stock; (7) how Koppers will service the debt it will incur if its plan is executed; and (8) how Koppers' plan is more advantageous than BNS Inc.'s offer.

The defendants asserting this counterclaim request an order dismissing Koppers' complaint, granting a preliminary and permanent injunction ordering Koppers to correct its Schedule 14D–9 to comply with the Williams Act, and granting fees and costs.

### C. The Law of Preliminary Injunctions

Under the law established by the Third Circuit Court of Appeals, a party seeking preliminary injunctive relief must establish four essential elements: (1) that it has a reasonable probability of success on the merits of its underlying claim, (2) that it will be irreparably injured by denial of the requested injunctive relief, (3) that the denial of the preliminary relief will result in greater harm for the moving party than that experienced by the non-moving party, and (4) that the granting of preliminary relief will be in the public interest. *SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1254 (3d Cir.1985); *Moteles v. University of Pennsylvania,* 730 F.2d 913,

918 (3d Cir.1984), *cert. denied,* 469 U.S. 855, 105 S.Ct. 179, 83 L.Ed.2d 114 (1984).

The four elements for preliminary injunctive relief constitute mixed questions of fact and law. *Gearhart Industries, Inc. v. Smith Int'l, Inc.,* 741 F.2d 707, 710 (5th Cir.1984).

While a preliminary injunction should be issued only with great care, *Hanson Trust PLC v. SCM Corp.,* 774 F.2d 47, 60 (2d Cir.1985), preliminary injunctive relief is a particularly useful remedy to prevent potential violations of the disclosure requirements of securities laws. As the Third Circuit Court of Appeals has stated:

> Prior to consummation of the offer the court still has a variety of methods available to it for correction of the misstatements or omissions. But once the tender offer has been consummated it becomes difficult, and sometimes virtually impossible to "unscramble the eggs." On the other hand, preliminary relief does not, in assuring that the offer will be lawfully made, sacrifice the legitimate desires of shareholders to accept the offer. If the offeror is subsequently vindicated after a trial on the merits, the offer may be renewed. Thus, in the normal situation, when it appears likely that the offer may contain materially misleading statements or omissions as made, the interest of the shareholders and of the public in full disclosure of relevant circumstances renders preliminary injunctive relief an appropriate method of remedying the deficiencies in disclosure before the offer is consummated.

*Ronson Corp. v. Liquifin Aktiengesellschaft,* 483 F.2d 846, 851 (3d Cir.1973), *cert. denied,* 419 U.S. 870, 95 S.Ct. 129, 42 L.Ed. 2d 108 (1974) (citations omitted). *See also Sonesta Int'l Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir.1973).

Proper judgment requires a delicate balancing of all of these elements. *Eli Lilly & Co. v. Premo Pharmaceutical Laboratories,* 630 F.2d 120, 136 (3d Cir.1979), *cert. denied,* 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980).

■ As a remedy for defects in tender offers, injunctions may often play a supporting role, and the courts will not hesitate to enjoin the tender offer until compliance with the securities laws can be determined. *Pacific Realty Trust v. APC Investments, Inc.,* 685 F.2d 1083, 1086 (6th Cir.1982). As alternative remedies, a court may also require curative disclosure, a permanent injunction in order to punish and deter intentional violations of the securities laws, or a permanent injunction if there are manipulative acts that cannot be cured through disclosure. *Id.*

■ In cases in which it is alleged that a tender offeror has failed to meet disclosure requirements, a showing of a material omission or misstatement in a tender offer prospectus does not of itself satisfy the requirement that the movant for preliminary injunctive relief show irreparable harm; the disputed tender offer must result in a situation which would be difficult to unravel, or the plaintiffs must identify specific injuries resulting from continuation of the offer in its present form for which monetary award or other legal remedy would not adequately compensate them. *Schmidt v. Enertec Corp.,* 598 F.Supp. 1528, 1543 (S.D.N.Y.1984).

Defendants maintain that the only injunctive relief available under the Williams Act is for corrective disclosure. *See, e.g., Hubco, Inc. v. Rappaport,* 628 F.Supp. 345 (D.N.J.1985); *Energy Ventures, Inc. v. Appalachian Co.,* 587 F.Supp. 734 (D.Del. 1984), and that no further relief is available.

## D. *The Williams Act*

Congress added the Williams Act to the system of federal securities regulation to fill a gap in the disclosure scheme of the 1933 and 1934 securities laws. The Williams Act is designed to insure that stockholders confronted with a tender offer, whether hostile or friendly, are provided with sufficient information about the transaction to make an informed investment decision. *Bolton v. Gramlich,* 540 F.Supp. 822, 836 (S.D.N.Y.1982); *Texasgulf, Inc. v. Canada Development Co.,* 366 F.Supp. 374, 420 (S.D.Texas 1973).

The House Interstate and Foreign Commerce Committee explained the purpose of

the Williams Act as follows: "The persons seeking control ... have information about themselves and about their plans which, if known to investors, might substantially change the assumptions on which the market price is based. This bill is designed to make the relevant facts known so that shareholders have a fair opportunity to make their decision." H.Rep. No. 1711, 90th Cong., 2d Sess., *reprinted in* 2 *U.S. Code & Admin.News*, 1968, pp. 2811, 2813.

■ Congress intended to assure basic honesty and fair dealing, not to impose an unrealistic requirement of laboratory conditions that might make the new statute a potent tool for incumbent management to protect its own interests against the desires and welfare of the stockholders. *Sonesta*, 483 F.2d at 255. Congress did not intend the Act to be a weapon with which to defeat tender offers. *Gray Drug Stores, Inc. v. Simmons*, 522 F.Supp. 961, 964 (N.D.Ohio 1981). "The Williams Act is not intended to favor either tender offerors or incumbent management. Congress recognized that while tender offers serve a useful purpose in providing a check on entrenchment and inefficient management, target management is in the best position to evaluate the offer and oppose a bid that is not in the best interests of the target's shareholders. Congress therefore attempted to preserve a neutral setting in which the contenders could fully and fairly present their arguments." Comment, A Critical Survey of Target Company Disclosure Obligations Under the Williams Act, 59 *Temple Law Quarterly* 1189, 1195 (1986).

Section 14(d)(1) is codified at 15 U.S.C. § 78n(d)(1) and provides in relevant part: (d)(1)—It shall be unlawful for any person, directly or indirectly, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, to make a tender offer for, or a request or invitation for tenders of, any class of any equity security which is registered pursuant to section 78l of this title, ... if, after consummation thereof, such person would directly or indirectly, be the beneficial owner of more than 5 per centum of such class, unless at the

time copies of the offer are first published or sent to security holders such person has filed with the Commission a statement containing the information specified in section 78m(d) and such information as the Commission by rules and regulations prescribe as necessary or appropriate in the public interest or to protect investors. The rest of this provision states in sum that all documents used to solicit the tender offer must follow the regulations of the Commission and must be filed with the Commission.

Section 14(e) is codified at 15 U.S.C. § 78n(e) and provides:

(e) It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

SEC Rule 14d-6, 17 C.F.R. § 240.14d-6, and SEC Schedule 14D-1, 17 C.F.R. § 240.14d-100, set forth the minimum disclosure requirements that must be satisfied for a tender offer to comply with Section 14(d)(1). These include, *inter alia:*

(1) the identity and background of the bidder, including information regarding civil and criminal lawsuits involving the bidder and its affiliates during the past five years, Schedule 14D—Item 2,

(2) Any borrowings by the bidder for the purpose of the tender offer, Schedule 14D —Item 4,

(3) The purpose or purposes of the tender offer and any plans or proposals regarding, among other things, the sale of a material amount of assets of the company or its subsidiaries, changes in the present board of directors or management,

and changes in the present capitalization, Schedule 14D—Item 5,

(4) Any contracts, arrangements or understandings between the bidders and any other person with respect to the target's securities, Schedule 14D—Item 7,

(5) Financial statements of the bidder where those statements are material to a decision whether to sell, tender or hold securities, Schedule 14D—Item 9.

■ The Williams Act "does not require that the offeror disclose all information that it possesses about itself or the target company," *Weeks Dredging & Contracting, Inc. v. American Dredging Co.*, 451 F.Supp. 468, 482 (E.D.Pa.1978), but only those "material objective factual matters" which a reasonable stockholder would consider important in deciding whether to tender his shares. *Data Probe Acquisition Corp. v. Datatab, Inc.*, 722 F.2d 1, 6 (2d Cir.1983), *cert. denied*, 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984).

■ Under the Williams Act, a target corporation has a private cause of action to obtain corrective disclosures from a tender offeror who has disseminated allegedly false and misleading tender offer materials. *Florida Commercial Banks v. Culverhouse*, 772 F.2d 1513 (11th Cir.1985). Some courts have held that to be successful on the merits of its claim, the target must prove four elements: (1) that a misleading statement or omission was made in connection with a tender offer, (2) the misstatement or omission was material, (3) the defendants knew or should have known of the duty to disclose or that the statement was misleading; some mental culpability more than negligence, and (4) that the misstatement or omission caused the plaintiff's injuries. *Lowenschuss v. Kane*, 520 F.2d 255, 268 (2d Cir.1975); *Chris–Craft Industries v. Piper Aircraft Corp.*, 480 F.2d 341, 362 (2d Cir.1973), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973).

■ For the purposes of the Williams Act, facts are deemed to be material if there is a substantial likelihood that a reasonable investor would consider them important or significant in making an investment decision. *Berg v. First American Bankshares, Inc.*, 796 F.2d 489, 495 (D.C.

Cir.1986). The materiality requirement does not require proof of substantial likelihood that disclosure of the omitted fact would have caused a reasonable investor to change his vote, but rather a showing that under all the circumstances the omitted fact would have assumed actual significance in deliberations of the reasonable shareholder. *Riggs National Bank v. Allbritton*, 516 F.Supp. 164, 172 (D.D.C.1981). Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

The issue of materiality is deemed an issue of fact, but in the last analysis it remains an objective question and may be resolved as a matter of law when reasonable persons could not differ as to the importance of the facts under scrutiny. *SEC v. Savoy Indust., Inc.*, 587 F.2d 1149, 1166 (D.C.Cir.1978), *cert. denied*, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979). *See also Osofsky v. J. Ray McDermott & Co., Inc.*, 725 F.2d 1057, 1059 (2d Cir.1984) (materiality is question of fact).

### III. FINANCIAL INTERESTS OF BRIGHT AGGREGATES, SL–MERGER, SPEEDWARD, AND THEIR PARENT COMPANIES

The issues underlying plaintiff's Williams Act allegations in this case stem in part from the financial structure of the tender offer and the transaction it contemplates. The nominal tender offeror is BNS Inc., which was formed for the sole purpose of acquiring the shares of Koppers through the tender offer. The three shareholders of BNS Inc. are Bright Aggregates (the Beazer interests), SL–Merger (the Shearson interests) and Speedward (the NatWest interests).

#### A. *BNS Partners*

Bright Aggregates, SL–Merger, and Speedward comprise a general partnership, BNS Partners. As previously explained,

Bright Aggregates has a 49% interest in BNS Partners, SL–Merger a 46.1% interest, and Speedward a 4.9% interest. The partners have contributed $50 million, and have borrowed another $21 million on margin against Koppers shares, to enable the partnership to buy additional Koppers shares; this is a small fraction of the capital required for the tender offer.

Prior to the commencement of the tender offer, BNS Partners had already acquired 1,636,000 shares of Koppers common stock, or 5.82% of the outstanding shares of Koppers. Bright Aggregates independently owned another 458,100 common shares, or 1.63% or the outstanding shares. Together the common stock owned by BNS Partners and Bright Aggregates constitute 7.45% of the total outstanding common stock, and 7.34% of the fully diluted common stock. Tender Offer, at 2.

The partnership agreement contemplates that BNS Partners will be dissolved if BNS Inc. purchases the partnership's shares pursuant to the tender offer. BNS Partners will transfer its shares and its liabilities to BNS Inc., leaving BNS Inc. as the sole vehicle for the interests of Bright Aggregates, SL–Merger, and Speedward.

### B. *BNS Inc.*

#### 1. Allocation of Common Shares, Voting Rights, and Other Rights

Currently, Bright Aggregates holds 0.490 shares of Class A common stock, which is all of the BNS, Inc. Class A common stock outstanding. SL–Merger holds 0.461 shares of the Class B common stock, and Speedward holds another 0.024 shares of the Class B common stock. Thus, 4.9% of the outstanding Class B common stock is allocated to Speedward, and the remainder to SL–Merger. Speedward holds all the outstanding shares of Class C common stock, or 0.025 shares. The Class C common shares have no voting rights. Holders of Class A and Class B common shares each elect two directors. The directors elected by the holders of the Class A shares cast three votes to the single vote of the directors elected by the holders of the Class B shares. Thus, Bright Aggregates'

directors control 6 of 8 votes on the BNS Inc. Board of Directors.

For all matters other than the election and removal of directors and certain amendments to the certificate of incorporation and by-laws, each share of Class A common stock is entitled to four votes, and each share of Class B common stock is entitled to one vote. On matters other than the election or removal of directors, the Class B and Class C common shares must vote in the same manner as the majority of Class A shares. In any event, Bright Aggregates holds approximately 80% of the voting power of the common stock. Tender Offer, at 16. SL–Merger and Speedward have agreed to waive their right to enforce any fiduciary duty on the part of Bright Aggregates or Bright Aggregates' directors for at least six years. Tender Offer, at 20.

BNS Inc. owned no Koppers shares prior to the commencement of the Tender Offer. At the completion of the tender offer, BNS Partners will transfer its shares of Koppers to BNS Inc., the partnership will be dissolved, and more shares in BNS Inc. will be distributed. Immediately after the distribution Bright Aggregates will hold 490 shares of Class A Common Stock, SL–Merger will hold 461 shares of Class B Common Stock, and Speedward will hold 24 shares of Class B Common Stock and 25 shares of Class C Common Stock.

#### 2. Bright Aggregates' Capital Contribution

To help finance the purchase, Bright Aggregates is to make a capital contribution of $298 million plus the Koppers shares it currently owns. Schedule 14D–1 (Amendment No. 12), at 2. Bright Aggregates' capital contribution is to be largely funded by loans from NatWest to Beazer PLC. Tender Offer, at 22. NatWest will loan $100 million to Beazer PLC; it will also use its best efforts to syndicate another $100 million, and will issue a $100 million letter of credit to Beazer PLC.

In return for Bright Aggregates' capital contribution, BNS Inc. is to issue its Series A Preferred Stock to Bright Aggregates.

The Series A Preferred Stock carries a 20% cumulative dividend, is non-voting, and is redeemable at any time. *See* Tender Offer 21–22. NatWest's loan to Beazer PLC is to be "repaid from funds generated internally by Beazer PLC." Tender Offer, at 28. However, up to $100 million from Part B of the bank syndicate Merger Facility may be used to redeem a portion of Bright Aggregates' Series A Preferred Stock. Schedule 14D–9, Amendment No. 12, Exhibit 39, at 3.

### 3. Shearson Holdings' Capital Contribution

Shearson Holdings is to make a capital contribution totalling $570 million. Shearson Holdings' contribution may take one of two forms, as determined at the discretion of BNS Inc. BNS Inc. may request Shearson Holdings to either (1) contribute $570 million in return for unsecured senior subordinated notes (the "Notes") from BNS Inc.; or (2) contribute $540 million in return for Series B Preferred Stock in BNS Inc., in which case Shearson Holdings will make an additional $30 million loan at the time of the merger. Schedule 14D–1, Amendment No. 12, at 2. The Notes are to be unsecured. The tender offer gives no indication of the criteria by which the choice between Notes and Series B Preferred Stock is to be made. If Shearson Holdings takes Notes, rather than the Series B Preferred Stock, then the tender offer anticipates that "the Notes will be refinanced, in part by the sale of Refunding Securities." Tender Offer, at 28.

If Shearson Holdings does take Notes rather than the Series B Preferred Stock, then BNS Inc. will issue, and Shearson will underwrite, up to $570 million of senior subordinated debentures (the "Refunding Securities") to refinance the Notes. Tender Offer, Amendment No. 12, Exhibit 39, at 2–3. The original tender offer stated that the Notes would be partially refinanced by funds from Part B of the Merger Facility, Tender Offer, at 28, but the most recent agreement indicates that this source will not be available to refinance the Shearson Notes. Amendment No. 12, Exhibit 39, at 3 ("the 'Incremental Amount' will be eliminated").

The Series B Preferred Stock carries a 15% cumulative annual dividend, and would have very limited voting rights. The Series B Preferred Stock may be redeemed at par 10 years from date of issuance, or at par plus accrued dividends after 5 years. Tender Offer, at 25. Shearson Holdings may exchange the Series B Preferred Stock for Notes upon the merger of Koppers and BNS Inc. We note that, while Bright Aggregates will take the Series A Preferred Stock, it is Shearson Holdings, and not SL–Merger, which would take the Series B Preferred Stock.

Upon consummation of the Merger, Shearson Holdings will also be granted warrants to purchase up to 10% of each class of the Borrower's outstanding equity securities. Amendment No. 12, Exhibit 39, at 2.

### 4. Bank Financing

The remainder of the financing for the tender offer is to be provided by borrowings from a syndicate of banks led by Citibank. The terms of the bank syndicate loan are rather intricate.

First, $864 million will be made available by the bank syndicate to finance the purchase of shares pursuant to the tender offer. This tender offer loan is referred to in the tender offer as the "Tender Offer Facility." After purchasing Koppers' shares pursuant to the tender offer, the offerors intend to cause a merger between Koppers and BNS Inc. or a subsidiary of BNS Inc. At that time, the bank syndicate will also provide further funds "to repay the Tender Offer Facility and to finance the Merger and related transactions." Tender Offer, at 25. This second borrowing is referred to as the "Merger Facility," and will be as high as $1.187 billion. "Part A" of the Merger Facility is a $543 million 18–month term loan. "Part B" of the Merger Facility is a $644 million eight-year term loan, made available on a revolving basis. $422 million of the Part B loan will be funded upon consummation of the merger. $100 million of Part B will be used to redeem Series A Preferred Stock held by Bright Aggregates, $165 million will be

used to refinance existing Koppers' debt. Part B will not be made available for repayment of outstanding Notes held by Shearson Holdings. Tender Offer, at 25, Amendment No. 12, Exhibit 39, at 2.

Citibank's own contribution to the bank syndicate loan is $320 million.

The bank syndicate loan is secured by a perfected first lien security interest in the assets of BNS Inc. (i.e. the shares of Koppers' stock). The bank syndicate loan is to be repaid:

> from funds generated internally by the Purchaser (including, after the Merger, funds generated by the Company), the sale of the Company's Chemical and Allied Products business and other, as yet unidentified, assets or other sources, which may include the proceeds of the sale of debt or equity securities.

Tender Offer, at 28.

### 5. Call and Put Options

According to the tender offer, Bright Aggregates is to receive an option (the "Call Option") to purchase all its shares in BNS Inc. at a fixed price, described as the "Option Price." Tender Offer, at 20. SL-Merger and Speedward are each to receive options to sell all of their BNS Inc. shares to Bright Aggregates (the "Put Options"). The tender offer explains in some detail how the exercise price for the options is to be determined.[1] Apparently, the Call and Put Options are limited to the common stock of BNS Inc.

One significant feature of the Option Price is that it provides for a generous 25% compound annual return on the investments of SL-Merger and Speedward. The

chief contributions of SL-Merger and Speedward apparently consist of their capital contributions to BNS Partners to purchase Koppers stock which will be transferred to BNS Inc.

The terms of these options tend to discourage the transfer of Shearson Lehman's and NatWest's interests in their subsidiaries, SL-Merger and Speedward, as well as any potential litigation by SL-Merger and Speedward against BNS Inc. The Stockholders' Agreement, in turn, severely restricts the transfer of SL-Merger's and Speedward's interests in BNS Inc. Under the Stockholders' Agreement, SL-Merger and Speedward waive their rights to enforce Bright Aggregates' fiduciary duties.

### 6. Summary

In summary, the tender offer explains that the financing for the initial acquisition of Koppers' stock by BNS Inc. is to be provided by (1) NatWest, through a loan to Beazer PLC, in return for which Bright Aggregates will receive Series A Preferred Stock; (2) Shearson Holdings, which will receive warrants, and either Notes (to be partially refinanced by "Refunding Securities"), or Series B Preferred Stock; and (3) a secured loan from a syndicate of banks led by Citibank.

### IV. DISCLOSURE OF INFORMATION REGARDING THE SHEARSON ENTITIES

#### A. *Shearson as a Bidder*

Plaintiff alleges that the Shearson defendants are "bidders," as that term is

---

1. The Tender Offer states:

 The Option Price ... with respect to BNS Shares held respectively by SLM [SL-Merger] and SW [Speedward], will be equal to the Initial Equity Contribution of SLM or SW, as the case may be, increased by an amount of capital appreciation on such Initial Equity Contribution calculated at the rate of 25 percent per annum, compounded annually.... The Option Price will be reduced to 25 percent of the amount calculated pursuant to the foregoing upon the occurrence of any of the following: (i) the material breach or violation by SLM or SW, as the case may be, of any provision of the Stockholders' Agreement or of the certificate of incorporation or by-laws

of the Purchaser, (ii) the commencement by SLM or SW, as the case may be, of any action or proceeding challenging the Stockholders Agreement or the certificate of incorporation or by-laws of the Purchaser (other than actions to enforce [their] Options) or (iii) any transaction which causes SLM or SW, as the case may be, to cease to be, directly or indirectly, wholly owned by SLBHI [Shearson Holdings] or NWIB [NatWest], respectively, or the grant of a security interest in the stock of SLM or SW, as the case may be, or of any entity that has not material assets or activities other than the direct or indirect ownership of such stock.
 Tender Offer, at 20.

defined by 17 C.F.R. § 240.100. Plaintiff therefore asserts that as bidders, the Shearson entities must file with the SEC and disclose to Koppers' shareholders the information listed in 17 C.F.R. § 240.14d–6, and that required in a Schedule 14D–1. We agree.

SEC Rule 14d–1(b)(1), 17 C.F.R. § 240.24d–1(b)(1), defines a "bidder" as "any person who makes a tender offer or on whose behalf a tender offer is made." Schedule 14D–1—General Instruction G(i), 17 C.F.R. § 240.14d–100, provides that the term "bidder" means "any person *on whose behalf* a tender offer is made." While the SEC's rules do not further define "bidder," in 1979 the SEC issued a Release which stated:

> The terms "bidder" and "subject company" provide shorthand references to the principal participants in a tender offer and avoid certain pejorative terms now commonly used to describe participants in a tender offer. The term "bidder" would mean any person who makes a tender offer or on whose behalf a tender offer is made.

*Securities Exchange Release No.* 15548, [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) Para. 81,935 at p. 81,216 (Feb. 5, 1979).

One court has observed that the SEC's distinction between "bidders and the rest of humanity is not subtle, but rather is used to make a simple differentiation between those who are central to the offer and those who are not." *Van Dusen Air, Inc. v. APL Limited Partnership, et al.,* Civil No. 4–85–1256, p. 4 (D.Minn.1985).

■ Case law addressing the definition of "bidder" is sparse, though a few guiding principles have emerged. A person who merely loans funds to the tender offeror to enable it to carry out the offer, and who receives no rights of any kind enabling it to influence the course of the tender offer, cannot be deemed a bidder. *Van Dusen Air, Inc. v. APL Limited Partnership, et al.,* Civil No. 4–85–1256, slip. op. at 2–6 (D.Minn.1985). Investors who form, with their own shares of the target's stock, a shell corporation as a target acquisition vehicle, and who made no additional commitments to finance an offer, are not bidders, *Warnco, Inc. v. Andrew Galef, et. al.,* Civil No. B–86–146, slip op. at 13–15 (D.Conn.1986).

Two cases from the United States District Court for the District of Delaware demonstrate the distinction between a bidder and the "rest of humanity." In *Revlon, Inc. v. Pantry Pride, Inc.,* 621 F.Supp. 804 (D.Del.1985), the court held that two corporations which had controlling interests in the parent and sole shareholder of the tender offeror were not "bidders" since they had not capitalized the tender offeror with their funds nor had they offered their funds to assist in the purchase. *Id.* at 814. Thus, the mere status as a majority shareholder in the parent of a tender offeror without financial participation is not enough. However, in *Pabst Brewing Co. v. Kalmanovitz,* 551 F.Supp. 882 (D.Del. 1982), the court held that two individuals who were the "primary motivating force behind the formation and capitalization" of the tender offerors which were formed for the sole purpose of consummating the offer had to disclose the information necessary to give the shareholders an opportunity to make an informed choice. *Id.* at 891–92.

In the case before us, thus far only the following entities have identified themselves as "bidders" by filing Schedule 14D–1 statements: BNS Inc., Bright Aggregates, and Beazer PLC. None of the Shearson-related entities (American Express, Shearson Holdings, Shearson Lehman, and SL–Merger) have filed a Schedule 14D–1.

■ The precise issue before us is whether there is a reasonable likelihood that Koppers could establish at a trial on the merits that Shearson Holdings, acting on its own, through its direct subsidiary Shearson Lehman, and its indirect subsidiary SL–Merger, Inc., is a person "on whose behalf" BNS Inc. is making the tender offer, thus making it a "bidder" within the meaning of SEC's regulations and consequently subjecting it to Williams Act disclosure requirements.

Defendants strenuously argue that Beazer is in complete control of the tender offer, and that the Shearson entities are entirely passive. Koppers contends, however, that Shearson has significant influence over the tender offer, if only by virtue of its huge cash investment of $570 million, and even though Shearson and Bright Aggregates will hold different interests in BNS Inc., Bright Aggregates' (Beazer's) borrowed financial contribution, in contrast, is only $298 million.

Defendants also argue that Shearson is only nominally involved since Mr. Beazer himself does not regard Shearson as a long-term partner in this transaction and intends to cause Bright Aggregates to exercise its call option to acquire Shearson's interest when circumstances permit it to do so.

Shearson Holdings became involved in the plan at a very early stage. While the actual origination of the idea to acquire Koppers is in dispute, we find it unnecessary to resolve this conflict in determining whether or not Shearson Holdings is a bidder.

According to the testimony at the hearing before this Court, Mr. Beazer desired to expand his U.S. holdings and had only a limited number of options. He and his advisor, Shearson Holdings, agreed that Koppers was a suitable target acquisition in May, 1987. Shearson Holdings began advising Mr. Beazer with respect to this acquisition in June, 1987.

Mr. Beazer testified that there were a very limited number of potential acquisitions in which he was interested, and that Koppers was a rather obvious candidate. Mr. Beazer had previously acquired interests in other construction materials businesses.

The early negotiations between Shearson and Beazer indicate that Shearson intended from the start to take an active, even an aggressive, role in the takeover. *See* Plaintiff's Exhibit 25—Minutes of Meeting of Mr. Beazer and others with Shearson Lehman representatives at Shearson Lehman Offices on August 20, 1987. On October 16, 1987, BNS Partners was formed. Shearson contributed $23.05 million to BNS Partners so that the partnership could begin purchasing shares of Koppers' stock ($4.610 million in October, 1987, $2.305 million in January, 1988, and $16.135 million in February, 1988). BNS Partners now owns 1,636,000 shares of Koppers' common stock. Should the tender offer be successful, the interests in the partnership would be transferred to BNS Inc.

Shearson Holdings' indirect subsidiary, SL–Merger, holds a significant equity interest in BNS Inc. SL–Merger currently owns .461 shares of Class B common stock, which represents 95.05% of the Class B common stock; the remaining .024 shares of class B common stock are held by Speedward. Shearson Holdings has also been granted warrants, which it may exercise to obtain 10% of each class of outstanding equity of BNS Inc., or any subsidiaries of BNS Inc.

The Class B shareholders have the right to elect two directors, but the Class B directors are only entitled to one vote each, compared to three votes for the directors elected by the Class A common shares. For all matters other than the election and removal of directors and certain amendments to the certificate of incorporation and by-laws, each share of Class A stock is entitled to four votes and each share of Class B stock is entitled to one vote. The Class B shares must be voted in the same manner as the Class A shares are voted. The BNS Stockholders Agreement severely restricts the transfer of SL–Merger's interests in BNS Inc.

Upon completion of the tender offer, BNS Inc. will issue more shares, so that the common stock will be allocated as follows: Bright Aggregates—490 shares of class A common stock, SL–Merger—461 shares of Class B common stock, Speedward—24 shares of Class B common stock and 25 shares of non-voting Class C common stock. Thus, through SL–Merger, Shearson Holdings would hold a significant, though not controlling, interest in BNS Inc.

Shearson Holdings will also acquire additional interests in BNS Inc. because of its direct contribution to the financing of the

purchase. Shearson Holdings has committed itself to provide a financial contribution of $570 million to BNS, Inc. and in return will take either (1) unsecured subordinated notes from BNS Inc.; or (2) Series B Preferred Stock in BNS, Inc. The Series B Preferred Stock carries a 15% cumulative divided and limited voting rights. If Shearson Holdings takes Notes, rather than the Series B Preferred Stock, then the tender offer anticipates that "the Notes will be refinanced, in part by the sale of Refunding Securities and the remainder from the [Citibank loan]." Tender Offer, at 28. If this occurs, Shearson Holdings will receive 3.5% of any principal amount of the Refunding Securities. Schedule 14D–1, Amendment No. 12, Exhibit 39, at 3.

There is more to the Shearson's interests than mere equity holdings, however. Shearson also stands to earn significant brokerage fees by: (1) underwriting the purchase of Koppers stock pursuant to the tender offer (some of which Shearson has already realized, since approximately 1,636,000 shares of Koppers have already been purchased through Shearson); (2) underwriting up to $570 million in Refunding Securities, if Shearson elects to take Notes rather than equity, in which case Shearson would be entitled to a fee payable of $2.5 million. Shearson will also earn a 25% compounded annual return on its equity investment in BNS Inc.'s common stock.

Thus, the Shearson entities play multiple roles in this complex transaction. They have acted, are acting, and will continue to act, as advisor, underwriter, equity partner, and financier to BNS Inc. In addition to their equity interests, they expect to earn significant fees as broker-dealer and underwriter of various financial offerings and transactions associated with this tender offer and its ensuing restructuring.

Although the tender offer contains no indication that the financial arrangement between Shearson and Beazer is anything but ordinary, in fact the arrangement is quite novel. There seems to be no dispute that this is the first time that a broker-dealer has become so intimately involved in a tender offer, *see* Wall St.J., Mar. 4, 1988, at 4. Shearson's role far surpasses that of a typical investment banker. Not only has Shearson assisted Mr. Beazer in developing a financial structure intended to enable him to acquire Koppers, Shearson has agreed to be a major equity participant in the takeover vehicles.

## B. *The Williams Act Vis-a-Vis Shearson*

The disclosure requirements of the Williams Act were designed to provide information to the market and to prevent market manipulation. They insure that shareholders have an opportunity to make an informed investment decision and additionally provide federal agencies such as the SEC and the Federal Reserve Board the opportunity to monitor tender offer filings for possible violation of federal securities laws.

 In light of this intention, we find a high probability that Koppers would be successful in establishing at a trial on the merits that Shearson Holdings is a bidder for Williams Act purposes. We believe that Shearson Holdings is playing a central participatory role in this tender offer. Shearson Holdings has unquestionably been a motivating force fueling the formation and capitalization of BNS, Inc., as it now stands, and as it is intended to stand after the purchase.

We would find it difficult to conclude that as a matter of law, one of the principal planners and players in this transaction is exempt from the disclosure requirements of the Williams Act solely because it would hold slightly less than a 50% interest in the tender offeror after the purchase. Shearson's role here is easily distinguishable from those cases which have found that a particular individual or entity was not a bidder for Williams Act purposes. Shearson's argument that it does not have "control" is not persuasive. Although Shearson argues that its right to vote the stock is overshadowed by the larger number of votes held by Beazer, the limited voting does not change the result that Shearson is one of the entities on whose behalf the tender offer is made.

### 1. Shearson and Schedule 14D-1—Item 10(b)

 Since we have concluded that, as proffered, the tender offer most likely will be found to violate the Williams Act due to, inter alia, the lack of any information regarding Shearson Holdings, we will address issues which we believe requires special attention in Shearson Holdings Schedule 14D-1. We want to emphasize that by discussing these particular issues, we do not in any way intend to limit the disclosure required by Shearson. In particular, we call Shearson's attention to Item 3 of Schedule 14D-1 regarding "Past contacts, transactions or negotiations with the subject company."

Item 10(b) of Schedule 14D-1 provides: that the bidder must disclose, "To the extent known by the bidder after reasonable investigation, the applicable regulatory requirements which must be complied with or approvals that must be obtained in connection with the tender offer" if such information is "material to a decision by a security holder whether to sell, tender or hold securities being sought in the tender offer."

In light of this disclosure requirement, we believe that Shearson Holdings must fully disclose to Koppers' shareholders what effect Shearson's projected equity position in Koppers would have on its status as a broker/dealer. The relationship between broker/dealers and their clients is not that of an ordinary merchant to his customer; strict standards of a fiduciary must be adhered to by the dealer. S. Jaffe, *Broker–Dealers and Securities Markets* § 7.01 (1978). By engaging in business, the broker-dealer makes a broad representation to the public at large that he will deal fairly with his customers and handle transactions in the usual manner and in accordance with trade custom. *Charles Hughes & Co. v. SEC,* 139 F.2d 434, 437 (2d Cir.1943).

Because of Shearson's identity as a major broker-dealer, and because its role in this tender offer is entirely unprecedented, we believe that knowledge of the ramifications of Shearson's equity involvement in a registered security *on its future broker-dealer activities* is material to a decision by each Koppers' stockholder. Shearson's multiple roles present it with delicate ethical issues that must be forthrightly addressed; the resolution of these may impact on Shearson's continued role in BNS Inc. While we do not, as a court, profess to be an expert in securities regulation, we do recognize potential conflicts of interest when we see them. Not only would the complexities of such issues be material to the decisions by the shareholders of Koppers, but important to the securities market as a whole. The Senate Report on the Williams Act explained the very broad public policy underlying such disclosure:

> The competence and integrity of a company's management ... are of vital importance to stockholders. *Secrecy in this area is inconsistent with the expectations of the people who invest in the securities of publicly held corporations and impairs public confidence in securities as a medium of investment.*

S.Rep. No. 550, 90th Cong. 1st Sess. 2 (1967) (emphasis added).

A brief review of current SEC Rules reveals that the SEC, acting with the interests of security holders in mind, is quite concerned with potential "double-dealing" by broker-dealers. *See SEC v. Roussel,* 485 F.Supp. 295, 296–97 (D.Kan.1980) (SEC filed, and was successful in, an action against broker-dealer alleging that broker-dealer defrauded stockholders of a target company by engaging in unlawful scheme to obtain control of the target).

SEC Rule 10b–6 makes it unlawful for a broker-dealer participating in a distribution of securities to bid for or purchase the security being distributed for any account in which he has a beneficial interest until after the broker-dealer has completed its participation in the distribution. 17 C.F.R. § 240.10b–6.

### C. *Analogous Rules and Regulations*

While the issue with which we are wrestling is not directly addressed by SEC rules, there are indications in analogous rules and regulations which provide guidance for the direction we should take. For instance:

a) The Exchange Act provides that no broker or dealer shall use any instrumentality of interstate commerce to induce the purchase or sale of over-the-counter stock by means of any "manipulative, deceptive, or other fraudulent device or contrivance." 15 U.S.C. § 78o(c)(1). The SEC has provided that this same prohibition applies to stock which is exempted from registration. 17 C.F.R. § 240.10b–3.

Pursuant to congressional authority, 15 U.S.C. § 78o(c)(1), the SEC has defined the devices and contrivances that are deemed to be manipulative, deceptive and otherwise fraudulent. SEC Rule 15d1–5 provides:

> The term "manipulative, deceptive, or other fraudulent device or contrivance" as used in section 15(c)(1) of the Act, is hereby defined to include any act of any broker, dealer ... controlled by, controlling, or under common control with, the issuer of any security, designed to effect with or for the account of a customer any transaction in, or to induce the purchase or sale by such customer of, such security unless such broker, dealer ..., before entering into any contract with or for such customer for the purchase or sale of such security, discloses to such customer the existence of such control, and unless such disclosure, if not made in writing, is supplemented by the giving or sending of written disclosure at or before the completion of the transaction.

17 C.F.R. § 240.15c1–5.

b) Rule 10b–5 prohibits any person from employing a fraudulent device or engaging in a fraudulent practice in the connection with the sale or purchase of any security. Thus, we find there is a serious question over whether the antifraud prohibitions of Rule 10b–5, which would apply to sales of Koppers' stock, could be construed to cover the actions of the broker-dealer which are expressly prohibited in Rule 15c1–5. It certainly appears possible that an analogy could be drawn.

We note that a class action lawsuit has already been filed in this court on behalf of customers of Shearson alleging that Shearson violated its fiduciary duties to them and manipulated the market by failing to disclose its role in the Koppers' tender offer while at the same time providing advice

with respect to Koppers stock. *See* Complaint in *Hartings v. Shearson Lehman Brothers Holdings, Inc., et. al.,* Civil Action No. 88–744 (W.D.Pa.1988).

Lastly, we note that despite the fact that the securities industry is a highly regulated industry, that although it is clear that the principle of clean hands, arms-length dealing and full disclosure permeates, Shearson has yet to voluntarily seek SEC or Federal Reserve Board review of the validity of its role in this transaction.

 Certainly, the market deserves an explanation of the measures (if any) taken by the Shearson interests to protect their many customers from the obvious conflicts of interest which the Shearson position here will engender. On balance, we believe that both the shareholders of Koppers and the securities markets deserve an explanation from Shearson as to how it intends to address the conflict of interest dilemma that its role in the Koppers takeover presents. In light of the unique position which Shearson has in the securities markets and the sheer novelty of this transaction, we construe Item 10(b) of Schedule 14D–1 to require Shearson to undertake an investigation of these issues and fully disclose its findings.

### D. *Shearson Must Disclose Financial Information*

 There is one final point to address regarding the required disclosure by Shearson. Shearson has argued that even if it is a bidder it does not have to disclose financial information. We disagree.

Item 9 of Schedule 14D–1 provides that where a bidder is other than a natural person and the bidder's financial condition is material to a decision by a security holder of the subject company on whether to sell, tender or hold securities being sought in the tender offer, adequate financial information concerning the bidder must be disclosed. We believe that a shareholder would find particularly important and material information regarding the financial condition of one of the prime financial contributors to this transaction.

While it may be true that those shareholders who have firmly decided to tender their shares will have little interest in the financial position of Shearson Holdings other than its ability to pay, other Koppers' shareholders still face a difficult problem in determining their most advantageous course of action, a problem enhanced by their ignorance of the course other shareholders are adopting. "If the bidder is in a flourishing financial condition, the stockholder might decide to hold his shares in the hope that, if the offer was only partially successful, the bidder might raise its bid after termination of the offer or infuse new capital into the enterprise. *Per contra,* a poor financial condition of the bidder might cause the shareholder to accept for fear that control of the company would pass into irresponsible hands." *Prudent Real Estate Trust v. Johncamp Realty, Inc.,* 599 F.2d 1140, 1147 (2d Cir.1979).

Thus, Shearson must fully comply with Item 9 in its Schedule 14D–1.

## V. DISCLOSURE OF PLANS TO REPAY FINANCIAL OBLIGATIONS AND CONTRIBUTIONS

### A. *The Plans Described in the Tender Offer*

SEC regulations recognize that the nature and terms of financing arrangements are highly material to the decisions of investors. Schedule 14D–1 requires that the bidder "state the source and the total amount of funds or other consideration for the purchase of the maximum number of securities for which the tender offer is made." 17 C.F.R. § 240.14d–100, Item 4(a). For borrowed funds, it also requires the bidder to provide a summary of "each loan agreement or arrangement containing the identity of the parties, the term, the collateral, the stated and effective interest rates, and other material terms or conditions relative to such loan agreement." Item 4(b)(1).

Furthermore, Item 5 of Schedule 14D–1 requires "bidders" to disclose "any plans or proposals which relate to or would result in ... a sale or transfer of a material amount of assets of the subject company or any of its subsidiaries." Such plans are considered highly material and their inadequate disclosure has frequently led to the issuance of preliminary injunctions. *See Marshall Field & Co. v. Icahn,* 537 F.Supp. 413, 416 (S.D.N.Y.1982); *Pargas, Inc. v. Empire Gas Corp.,* 423 F.Supp. 199, 209 (D.Md.1976), *aff'd,* 546 F.2d 25 (1976). Defendants argue, however, that Item 5 only requires disclosure of those plans or proposals that rise to the level of firm intentions. *Elec. Specialty v. Int'l Controls Corp.,* 409 F.2d 937, 948 (2d Cir.1969).

The tender offer contemplates that $543 million of the money borrowed from the syndicate of banks led by Citibank at the time of the merger (Part A of the Merger Facility) is to be repaid within 18 months. The remaining $644 million of the Merger Facility is an eight-year term revolving loan (Part B). There are apparently no specific plans for repayment of Part B of the Merger Facility.

However, it is the apparent desire of both the Beazer interests and the Shearson interests that Shearson's interests in BNS Inc. should be transferred to Beazer with relative despatch. Of course, BNS Inc. and/or the Beazer interests will require a tremendous amount of capital to both repay the 18–month term portion of the bank loan ($543 million of the $1,187 million Merger Facility), and also repay the contributions of the various Shearson interests ($570 million if Shearson Holdings takes Notes, or $540 million in Series B Preferred Stock along with a $30 million loan, plus $23.05 million contributed by SL–Merger to BNS Partners), not to mention Speedward's relatively minuscule contribution to BNS Partners of $2.45 million. This is in addition to interest owed on the bank loans, dividends due on the preferred stock (20% to Bright Aggregates' Series A Preferred Stock, and 15% to Shearson Holdings' Series B Preferred Stock), and the money borrowed by BNS Partners to purchase Koppers' stock on margin. Furthermore, none of this accounts for Mr. Beazer's borrowings from NatWest (up to $300 million), which will apparently be serviced and repaid from his other holdings. Tender Offer, at 28.

The tender offer indicates that part of BNS Inc.'s borrowings are to be repaid with funds generated by the sale of certain Koppers' assets, notably including the Chemical and Allied Products Division (Mr. Beazer has indicated that his interest is primarily in the Construction Materials and Services Division). The tender offer contains the following statements:

The [bank loan agreement] will provide that, until Part A is repaid in full, the Borrower [the survivor of the merger of BNS Inc. and Koppers] will have an obligation to sell certain assets ("Designated Assets") for cash at fair market value and to use the proceeds to repay Part A. Designated Assets will include the Company's Chemicals and Allied Products business (which is to be sold for net cash proceeds of not less than $400 million before payment of associated taxes, unless the fair market value is determined to be lower) and certain other assets to be specified. In addition, the Borrower will be required to make prepayments of Part B based on a percentage of "consolidated excess cash" (which will be defined), and to apply the proceeds of any sale of assets other than Designated Assets (except to the extent of certain permitted reinvestments in capital assets) and amounts received on account of overfunded pension plans to the prepayment of Part B.

Tender Offer, at 27.

It is anticipated that borrowings by Beazer PLC under the NatWest Loan Facility will be repaid from funds generated internally by Beazer PLC. It is anticipated that borrowings by the Purchaser under the Bank Facilities will be repaid from funds generated internally by the Purchaser (including, after the Merger, funds generated by the Company), the sale of the Company's Chemical and Allied Products business and other, as yet unidentified, assets or other sources, which may include the proceeds of the sale of debt or equity securities. It is anticipated that the [Shearson] Notes

will be refinanced, in part by the sale of Refunding Securities.

Tender Offer, at 28.

Upon consummation of the Merger or, possibly, the Purchaser's earlier acquisition of control of the company's Board of Directors, the Purchaser intends to cause the Company to sell its Chemical and Allied Products business. As discussed in Section 13, the Purchaser may cause the Company to sell an aggregates plant located in Southern California if necessary in connection with certain antitrust considerations. In addition, the Purchaser intends to cause the Company to sell other (as yet unidentified) assets in order to repay Part A of the Merger Facility described above (see Section 10) to the extent proceeds from the sale of the Chemical and Allied Products business and from any such sale of such aggregates plant are not sufficient to make such repayment.

Tender Offer, at 35.

B. *Incomplete Revelations Regarding the Sale of Assets*

 The offeror's intended sale of Koppers' Chemical and Allied Products ("CAP") Division is a required disclosure, under Items 4(b)(1) and 5. While Koppers argues that plans regarding the CAP Division are "buried" in the tender offer and therefore not adequately disclosed, defendants point out that the CAP sale is disclosed at three separate locations in the tender offer, so that this item of information was immediately apparent to Koppers and its shareholders. While the plans to sell the CAP Division might have been more prominently displayed, we do not believe that Koppers has shown a reasonable likelihood of success on its claim that the offerors did not adequately disclose this fact.

 There is a curious aspect of defendants' disclosure with respect to sales of assets, however. There is the fact that after-tax proceeds from the disclosed sales will retire only a fraction of Part A of the Merger Facility, which is $543 million, and which must be retired within 18 months.

Although there was some conflict in the evidence presented at the hearing, the CAP Division is generally valued at between $375 and $450 million before tax. The after-tax yield from the sale is unknown. BNS Inc. has also agreed to divest the southern California facility, but that will only yield an additional $30–50 million. Thus, additional funds will have to be raised, just to repay the bank loan. Elsewhere, Beazer has indicated that the pretax amount of assets to be sold will be $700 million. Yet the tender offer does not identify any additional specific assets to be sold.

Defendants maintain that the tender offer's disclosure of BNS Inc.'s intentions with respect to the sale of assets could not be more plain. The tender offer plainly states that the CAP Division will be sold, and that other as yet unidentified assets will also be sold. Tender offerors are not required to make predictions of future behavior in connection with tender offers and need not disclose plans or designs which are necessarily contingent or indefinite. *Crane Co. v. Harsco Corp.*, 509 F.Supp. 115, 119 (D.Del.1981).

Undoubtedly, significant assets in addition to the CAP business will have to be sold, particularly if Beazer is to buy out the Shearson interests in the near future. BNS Inc. discloses no definitive intention to sell any specific assets other than the CAP business and the mandated sale of the Southern California aggregates business. According to defendants, nothing more need be disclosed.

We are concerned, however, by the lack of information regarding plans which the defendants may have to sell other significant assets. Obviously, since the sale of the CAP Division will generate only a fraction of the funds necessary to repay the bank loans, BNS Inc. is likely to dispose of other significant portions of Koppers. It is difficult to believe that defendants do not have more definite plans than they have disclosed thus far. They will obviously not be able to make up the difference by the sale of such dispensable luxuries as corporate jets. Defendants allude to "amounts received on account of overfunded pension plans," Tender Offer, at 27, yet give no indication of how much money is available in the "overfunded" pension plans.

It is clear that a sum of money well in excess of half a billion dollars will be required in order to buy out the Shearson interests. This is more than the sale of the CAP Division is likely to generate pre-tax, and those funds are ear-marked for other purposes. Because of the unusual nature of the Shearson interests in this transaction, the source of the money to buy back the Shearson interests is particularly material, and should be disclosed. *Cf. Riggs Nat. Bank of Wash. v. Allbritton*, 516 F.Supp. 164, 173–75 (D.D.C.1981) (special circumstances requiring offeror to disclose information concerning his ability to repay borrowed principal and interest).

## VI. DISCLOSURE OF ALLEGED VIOLATIONS OF THE MARGIN REQUIREMENTS

Koppers alleges at Count III of its Second Amended Complaint that the transaction contemplated by the Tender Offer violates Section 7 of the Exchange Act [15 U.S.C. § 78g] and Federal Reserve Board Regulations G, T, U, and X [12 C.F.R. §§ 207, 220, 221, and 224] in that:

> Banks and broker-dealers are prohibited from lending more than 50% of funds used to purchase stock if such stock is to be used to secure the loan, and BNS is a shell company which will incur more than 50% debt if it acquires the stock.

15 U.S.C. § 78g(a) provides:

> For the purpose of preventing the excessive use of credit for the purchase or carrying of securities, the Board of Governors of the Federal Reserve System shall ... prescribe rules and regulations with respect to the amount of credit that may be initially extended and subsequently maintained on any security (other than an exempted security).

The margin requirements are intended to maintain the integrity of the credit markets, as explained in the legislative history:

> The main purpose of these margin provisions ... is not to increase the safety of security loans for lenders. Banks and brokers normally require sufficient col-

lateral to make themselves safe without the help of law. Nor is the main purpose even protection of the small speculator by making it impossible for him to spread himself too thinly—although such a result will be achieved as a byproduct of the main purpose.

The main purpose is to give a Government credit agency an effective method of reducing the aggregate amount of the nation's credit resources which can be directed by speculation into the stock market and out of other more desirable uses of commerce and industry—to prevent a recurrence of the pre-cash situation where funds which would otherwise have been available at normal interest rates for uses of local commerce, industry, and agriculture, were drained by far higher rates into security loans and the New York call market.

H.R.Rep. No. 1383, 73d Cong., 2d Sess. 709 (1934), *cited in Walck v. American Stock Exchange, Inc.,* 687 F.2d 778, 789 (3d Cir. 1982), *cert. denied,* 461 U.S. 942, 103 S.Ct. 2118, 77 L.Ed.2d 1300 (1983); *see also Daley v. Capitol Bank & Trust Co.,* 506 F.2d 1375, 1377 (1st Cir.1974); *Naftalin & Co., Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 469 F.2d 1166, 1180 (8th Cir. 1972); *Panayotopulas v. Chemical Bank,* 464 F.Supp. 199, 202 (S.D.N.Y.1979).

The regulations promulgated by the Board of Governors of the Federal Reserve System pursuant to this statute are contained in 12 C.F.R. §§ 200–299. Regulation G, codified at 12 C.F.R. § 207, governs "Securities Credit by Persons other than Banks, Brokers, or Dealers." Regulation T, 12 C.F.R. § 220, addresses "Credit by Brokers and Dealers." Regulation U, 12 C.F.R. § 221, addresses "Credit by Banks for the Purpose of Purchasing or Carrying Margin Stock." Regulation X, 12 C.F.R. § 224, extends liability to borrowers who willfully cause credit to be extended in violation of Regulations G, T, or U.

The tender offer makes the following disclosure with respect to margin requirements:

*Federal Reserve Board Regulation.* Federal Reserve Board Regulations G, T, U and X restrict extensions of credit for the purpose of buying or carrying margin stock. Regulations G and U generally provide that credit used to buy or carry margin stock which is directly or indirectly secured by margin stock may not exceed 50% of the market value of the margin stock securing the credit at the time such credit is extended. As stated in an interpretation issued by the Federal Reserve Board in January 1986, the Board is of the view that debt securities issued by a "shell" corporation to finance an acquisition or margin stock may be deemed indirectly secured by that margin stock for purposes of the margin regulations. Based on its understanding of Regulations G, T, U and X, published interpretations of the Board and other authorities, the Purchaser believes that the Bank Facilities will be in compliance with Regulation U and that Regulations G, T, U and X are or will be inapplicable to the other arrangements described in Section 10.

The Purchaser [BNS Inc.] is aware of an unreported Order issued by the Federal District Court for the Central District of California where, in the context of a preliminary injunction, the Court ruled that the moving party showed a probability of successfully demonstrating that under the facts there presented an issue of securities designated as preferred stock constituted an extension of credit for margin purposes, and that such extension of credit would, under the circumstances of that case, violate Regulation G. The Purchaser believes, without conceding the correctness of such decision, that such determination was based on facts distinguishable from those here present. In particular, the Purchaser believes that the terms of the Series B Preferred Stock, insofar as they are now agreed and as they will be finally determined, are and will be materially different from those of the preferred stock in question in the California proceeding. A challenge to the Purchaser's financing alleging a violation of the margin regulations could, if adversely determined, impair the Purchaser's ability to obtain financing for the Offer.

Tender Offer, at 37. At the hearing, counsel for the defendants stated that the Order alluded to is from the case *Caesars World, Inc. v. Sosnoff,* —— F.Supp. ——, CV 87–1622 (C.D.Cal. June 8, 1987) (order granting plaintiff's motion for preliminary injunction).

### A. *Standing of the Plaintiff*

■ Defendants have argued that plaintiff lacks standing to pursue this claim. It is true that a target corporation lacks standing in this circuit to enforce the margin requirements, since Section 7 confers no private right of action, *Walck,* 687 F.2d at 789, *Revlon, Inc. v. Pantry Pride, Inc.,* 621 F.Supp. 804, 814 (D.Del.1985), and enforcement power lies with the Federal Reserve Board. However, a target certainly has standing under the Williams Act to allege a failure to disclose material margin violations. *Revlon,* 621 F.Supp. at 814.

Moreover, the Federal Reserve Board has explicitly noted the important role of the judiciary in applying the margin rules to specific facts presented in litigation:

> Questions concerning application of the interpretation to individual fact situations cannot, of course, be excluded, and can be expected to arise in conjunction with litigation on other matters between companies involved. The Board has had a longstanding policy that, where the parties are involved in litigation, the Board would refrain from comment that might affect this litigation. Moreover, this policy is fully consistent with the longstanding position of the Board that a private right of action under the margin requirements is an important mechanism for effective resolution of margin requirements issues in partiuclar factual situations.

Board of Governors of the Federal Reserve System, Final Interpretative Rule, Regulation G, Docket No. R–0562, at Section III. B. (January 10, 1986), *reprinted in* D. Block & H. Pitt, Hostile Battles for Corporate Control 1986, at 999 (1986) [hereinafter "Final Interpretative Rule"]. Thus, the fact that the Federal Reserve Board has not as yet intervened in this transaction is of little consequence to the substantive issues underlying plaintiff's allega-

tions, in light of the Board's pronounced reluctance to interfere with litigation.

### B. *Bank Syndicate Borrowings*

■ As an initial matter, we note that the bank syndicate has committed to lend $864,380,000 in the so-called Tender Offer Facility, in return for a first lien security interest in Koppers' stock. *See* Schedule 14D–1, Exhibit 1, at 26; Exhibit 11, Annex at 6; Amendment 12, Exhibit 39, at 3. Regulation U limits the credit which banks may extend for the purpose of purchasing or carrying margin stock to 50% of the current market value of the stock. 12 C.F.R. § 221.3(a) & 221.8(a). Koppers stock is margin stock. *See* 12 C.F.R. § 221.2(h).

According to our calculations, the $864,380,000 in the Tender Offer Facility represents slightly *more* than 50% of the total value of all Koppers' stock, including the stock currently held by Bright and BNS Partners. Before payment of fees, $1,687,211,360 is required to purchase all the 28,119,851 outstanding common shares at $60 per share, and an additional $16,162,500 to purchase the 150,000 outstanding preferred shares at $107.75 per share, for a total of $1,703,373,860. *See Pabst Brewing Co. v. Kalmanovitz,* 551 F.Supp. 882 (D.Del.1982) (tender offer price represents value of stock).

We therefore find that the value of all outstanding Koppers stock is $1,703,373,860, although as much as $1,732,000,000 will be available to consummate the tender offer ($298,000,000 from Bright, $570,000,000 from Shearson Holdings, and $864,380,000 from the bank syndicate). Presumably, the excess funds will be used to pay various transaction fees. However, Regulation U contains no allowance for the inclusion of transaction fees in the maximum loan value. Regulation U quite plainly states: "The maximum loan value of any margin stock except options is fifty per cent of its current market value." 12 C.F.R. § 221.8(a).

Yet $864,380,000 is 50.75% of $1,703,373,860, the total value of Koppers' outstanding stock. This presents an apparent violation of Regulation U, which the tender offer entirely fails to disclose. We note

that Citibank's agreement with BNS Inc. stipulates that it will lend "$864,380,000, or such lesser amount allowed by regulation U for the purchase of the Shares." Schedule 14D–1, Amendment No. 12, Exhibit 41, Exhibit A. Assuming that the bank syndicate loan will indeed be limited so as to comply with Regulation U, and that it will be secured in its entirety by Koppers' stock, the maximum amount of financing available from the bank syndicate loan is actually $851,686,930. This is a material fact, and should be disclosed. However, for the purposes of this analysis, we will continue our discussion based on the assumption that $864,380,000 is available from the bank syndicate.

### C. Shearson Holdings and the Margin Requirements

1. Applicable Margin Regulations

Since the 50% limitation is completely preempted by the bank syndicate loan, under Regulation G and Regulation U no additional funds directly or indirectly secured by the margin stock may be lent to the purchaser. Thus, there is a potential violation of the margin rules if other financing is directly or indirectly secured by the margin stock. The analysis is made somewhat more complex by the fact that it is unclear whether Shearson Holdings will take Notes, or Series B Preferred Stock.

Regulation T, 12 C.F.R. § 220, governs the extension of credit by and for brokers and dealers. Regulation G, 12 C.F.R. § 207, addresses the extension of so-called "purpose credit" (credit used to purchase margin stock) by persons other than banks, brokers, or dealers. It is clear that Regulation T does not contemplate Shearson Holdings' unusual role in this transaction. Instead, Regulation T is addressed to issues that arise in the ordinary course of business of broker dealers, such as the maintenance of various accounts by broker dealers for the benefit of their customers (e.g., margin accounts, arbitrage, cash, and omnibus accounts), the procurement of loans to customers by third parties, the clearance of securities, and the broker dealer's ability to borrow against stock. In sum, Regulation T is in the nature of a housekeeping provision to guide the ordinary transactions of broker dealers.

Regulation U limits the credit which banks may extend for the purpose of purchasing or carrying margin stock to 50% of the current market value of the stock. 12 C.F.R. § 221.3(a) & 221.8(a).

Regulation G, in contrast, governs the extension of purpose credit by persons other than banks, brokers, and dealers. Typically, Regulation G lenders include such entities as savings and loan associations, credit unions, insurance companies, and companies with employee stock option plans. Regulation G strictly prohibits Regulation G lenders from extending credit, directly or indirectly secured by margin stock, in excess of 50% of the current market value of the margin stock. 12 C.F.R. § 207.

Regulation T contains the following provision:

A [broker or dealer] may not arrange for the extension or maintenance of credit to or for any customer by any person upon terms and conditions other than those upon which the [broker or dealer] may itself extend or maintain credit under the provisions of this part, except that this limitation shall not apply to credit arranged for a customer which does not violate [12 C.F.R. §§ ] 207 and 221 ... and results solely from:

(a) Investment banking services, provided by the [broker or dealer] to the customer, including, but not limited to, underwritings, private placements, and advice and other services in connection with exchange offers, mergers, or acquisitions, except for underwritings that involve the public distribution of an equity security with installment or other deferred payment provisions.

12 C.F.R. § 220.13 The exception contained in 12 C.F.R. § 220.13(a) permits investment banks associated with brokers and dealers to provide certain financing for mergers and acquisitions, so long as the financing does not violate Regulations G and U. Thus, brokers and dealers have apparently undertaken the practice of providing so-called "bridge loans" to clients

who acquire shares in the context of tender offers. *See* Wall St. J., Mar. 4, 1988, at 4 ("The taking of equity in [the Koppers] hostile bid isn't a far cry from Shearson's bustling business in bridge loans, in which the investment bank makes ·temporary loans to corporate clients to· support take-overs. In those loans, Shearson and other investment banks use their own capital; the loans are typically refinanced by the subsequent sale of high-yield securities known as junk bonds."). However, the "bridge loans" must comply with Regulations G and U. We note in passing that the Federal Reserve Board and its Staff takes generally consistent approaches in its inter-pretations of the Regulations, rather than rigidly distinguishing the various Regula-tions. *See, e.g.,* 12 C.F.R. § 207.112(e) (cit-ing Fed.Res.Reg.Ser.Para. 5–917.12, an opinion interpreting Regulation U, to illus-trate the Federal Reserve Board's view that nominally unsecured credit may be indirectly secured by margin stock under regulation G); Fed.Res.Reg.Ser.Para. 5–917.15 (October, 1984) (interpreting applica-tion of Regulations G and U).

In this instance, Shearson Holdings is providing approximately a third of the capi-tal BNS Inc. requires to consummate this tender offer. In return, Shearson Holdings will take either Notes (which will subse-quently be refinanced by the so-called "Re-funding Securities), or Series B Preferred Stock.

We begin by noting that defendants' var-ious memoranda focus on their contention that the Series B Preferred Stock is an equity instrument rather than a debt in-strument. There is so much sound and fury surrounding the debt v. equity charac-teristics of the Series B Preferred Stock, that the reader is almost distracted enough to overlook the fact that the Notes, which Shearson Holdings may take as an alterna-tive to the Series B Preferred Stock, are indisputably debt instruments. The tender offer contemplates that Shearson will take *either* Notes *or* Series B Preferred Stock in return for its capital contribution. Thus, we will first analyze the application of the margin requirements to the Notes.

**2. The Notes**

■ Section 207.112 is a Federal Re-serve Board Ruling interpreting Regulation G in the context of a corporate acquisition by a shell corporation. Section 207.112 contemplates a situation in which:

(b) ... the acquiring company, Compa-ny A, controls a shell corporation that would make a tender offer for the stock of Company B, which is a margin stock.... The shell corporation has vir-tually no operations, has no significant business function other than to acquire and hold the stock of Company B, and has substantially no assets other than the margin stock to be acquired. To finance the tender offer, the shell corpo-ration would issue debt securities which, by their terms, would be unsecured. If the tender offer is successful, the shell corporation would seek to merge with Company B. However, the tender offer seeks to acquire fewer shares of Compa-ny B than is necessary under state law to effect a "short form" merger with Com-pany B, which could be consummated without the approval of shareholders or the board of directors of Company B.

The Board of Governors found that the debt issued by the shell corporation would clearly be "purpose credit," earmarked for the purchase of margin stock, as defined by § 207.2(1). The Board also found that the debt was not "directly" secured by the margin stock. Therefore, the Board pro-ceeded to analyze whether the debt was "indirectly" secured by the margin stock. In order to completely and accurately present the essence of the Board's Ruling, it is necessary to reproduce a large portion of the Ruling:

(d) As the Board has recognized, "indi-rect security" can encompass a wide vari-ety of arrangements between lenders and borrowers with respect to margin stock collateral that serve to protect the lenders' interest in assuring that a credit is repaid where the lenders do not have a conventional direct security interest in the collateral. See 12 C.F.R. 211.113. However, credit is not indirectly secured by margin stock if the lender in good

faith has not relied on the margin stock as collateral extending or maintaining credit. See 12 C.F.R. 207.2(f)(2)(iv).

(e) The Board is of the view that ... the debt securities would be presumed to be indirectly secured by the margin stock to be acquired by the shell acquisition vehicle. The staff has previously expressed the view that nominally unsecured credit extended to an investment company, a substantial portion of whose assets consist of margin stock, is indirectly secured by the margin stock. See Federal Reserve Regulatory Service Para. 5–917.12. This opinion notes that the investment company has substantially no assets other than margin stock to support indebtedness and thus credit could not be extended to such a company in good faith without reliance on the margin stock as collateral.

(f) The Board believes that this rationale applies to the debt securities issued by the shell corporation described above. At the time the debt securities are issued, the shell corporation has substantially no assets to support the credit other than the margin stock that it has acquired or intends to acquire and has no significant business function other than to hold the stock of the target company in order to facilitate the acquisition. Moreover, it is possible that the shell may hold the margin stock for a significant and indefinite period of time, if defensive measures by the target prevent consummation of the acquisition. Because of the difficulty in predicting the outcome of a contested takeover at the time that credit is committed to the shell corporation, the Board believes that the purchasers of the debt securities could not, in good faith, lend without reliance on the margin stock as collateral. The presumption that the debt securities are indirectly secured by margin stock would not apply if there is specific evidence that lenders could in good faith rely on assets other than margin stock as collateral, such as a guaranty of the debt securities by the shell corporation's parent company or another company that has substantial non-margin stock assets or cash flow. This presumption would

also not apply if there is a merger agreement between the acquiring and target companies entered into at the time the commitment is made to purchase the debt securities or in any event before loan funds are advanced. In addition, the presumption would not apply if the obligation of the purchasers of the debt securities to advance funds to the shell corporation is contingent on the shell's acquisition of the minimum number of shares necessary under applicable state law to effect a merger between the acquiring and target companies without the approval of either the shareholders or directors of the target company. In these two situations where the merger will take place promptly, the board believes the lenders could reasonably be presumed to be relying on the assets of the target for repayment.

(g) In addition, the Board is of the view that the debt securities ... are indirectly secured by margin stock because there is a practical restriction on the ability of the shell corporation to dispose of the margin stock of the target company. "Indirectly secured" is defined in § 207.2(f) of the regulation to include any arrangement under which the customer's right or ability to sell, pledge, or otherwise dispose of margin stock owned by the customer is in any way restricted while the credit remains outstanding. The purchasers of the debt securities issued by a shell corporation to finance a takeover attempt clearly understand that the shell corporation intends to acquire the margin stock of the target corporation in order to effect the acquisition of that company. This understanding represents a practical restriction on the ability of the shell corporation to dispose of the target's margin stock and to acquire other assets with the proceeds of the credit.

The $570 million Notes which Shearson Holdings may take would be issued by BNS Inc. Tender Offer, at 22. The Notes would clearly be issued in exchange for "purpose credit," earmarked for the purchase of margin stock, as defined by § 207.2(1). The Notes would not be direct-

ly secured by margin stock, nor would they be secured by any other obvious means. However, the Notes are to be refinanced by Refunding Securities. Apparently, this will occur shortly after the tender offer is consummated, since the tender offer discloses that the Loan Agreement pertaining to the Notes will terminate on June 30, 1988.

Thus, we must consider whether there is a likelihood that the Notes would be "indirectly secured" by (Koppers') margin stock within the meaning of the margin regulations. Since BNS Inc. is a shell corporation, whose sole assets upon consummation of the tender offer would be margin stock, the debt securities are presumed to be indirectly secured by margin stock under § 207.112(e). The Board's rationale in § 207.112 is directly applicable. The exceptions in § 207.112(f) are not directly applicable. First, there is no specific evidence that the lenders may "in good faith rely on assets other than margin stock as collateral, such as a guaranty ... by the shell corporation's parent company or another company." There is simply no straightforward indication that the Beazer interests or anyone else is guaranteeing the Notes. Secondly, the tender offer does not contemplate that there can be a "merger agreement between the acquiring and target companies entered into at the time the commitment is made ... or in any event before loan funds are advanced." The tender offer proposes a merger agreement sometime *after* Shearson Holdings advances loans funds, and *after* Koppers' shares are acquired pursuant to the tender offer. Finally, the tender offer, and the advancement of funds by Shearson Holdings, is not "contingent on the shell's acquisition of the minimum number of shares necessary under applicable state law to effect a merger between the acquiring and target companies without the approval of either the shareholders or directors of the target company." There is no such condition in the tender offer. Instead, the tender offer specifically contemplates the acquisition of a number of shares less than that required to effect a merger without shareholder or board approval. Tender Offer, at 1, 29–30. Indeed, elsewhere in the tender offer the purchaser specifically reserves the option to forego a merger altogether:

> The exact timing and details of the merger will depend upon a variety of factors and legal requirements and the number of Shares acquired by the Purchaser pursuant to the Offer, and upon the approval of the Company's Board of Directors and stockholders if required by applicable law of the terms of the Certificate or By–Laws of the Company. *Although it is the Purchaser's intention, if each of the rights Condition, the Section 203 Condition and the Supermajority condition is satisfied and not waived, to propose and seek to consummate the Merger, the Purchaser can give no assurance that the Merger will be consummated or as to the timing of the Merger. The Purchaser expressly reserves the right not to propose any merger or similar business combination involving the company, or to propose a merger or other business combination on terms other than those set forth herein*
>
> . . . .

Tender Offer, at 35 (emphasis added).

However, the Loan Agreement contemplates that the Notes will be refinanced by the Refunding Securities by June 30, 1988, regardless of whether the merger occurs. Thus, the purpose credit extended by Shearson expires shortly after the acquisition, to be repaid through the offering of Refunding Securities. We conclude, therefore, that although it is a close question, the Notes are arguably within the spirit of the exceptions contained in 12 C.F.R. § 207.112(f). The Federal Reserve Board has explained that the interpretation contained in § 207.112 "is not intended as an exercise of the Board's rulemaking authority conferred by statute or as binding upon reviewing courts, but as descriptive of those facts that indicate a secured transaction within the meaning of the margin requirement rules." Final Interpretative Rule, at I. The exceptions involve the availability of other security, or an assurance of an immediate merger, so that the shares are secured by the target's assets. The short-term nature of the Loan Agree-

ment, together with its provision for Refunding Securities, gives some credibility to the thesis that Shearson Holdings would be relying on assets, rather than margin stock. However, we also note that the fact that a merger might not be effected before the Refunding Securities are issued creates a conflicting inference, as does the lack of a specific guaranty by an entity with substantial assets, such as Beazer. We stress that we are making a preliminary finding. The application of the margin requirements to the Series B Preferred Stock is somewhat more troublesome.

### 3. The Series B Preferred Stock

■ As we noted previously, in arguing that there is no potential violation of the margin requirements, defendants seek to characterize Shearson Holdings' interests in BNS Inc. as having the nature of equity. However, in the context of arguing that the Shearson entities are not "bidders" within the meaning of SEC Rule 14d–1(b)(1), *see supra* Part IV.A., defendants argue just as forcefully that Shearson Holdings and its indirect subsidiary SL–Merger are entirely passive investors, with virtually no control over the future direction of BNS Inc. We will attempt to reconcile these contradictory positions as best we can.

Unlike the Notes, the Series B Preferred Stock will remain in existence for an indefinite period, possibly for a number of years. If the Series B Preferred Stock is debt, then its indefinite duration certainly makes it less likely than the Notes to fit within the exceptions listed in § 207.112(f). Defendants contend that, unlike the securities in the *Caesar's World* case, the Series B Preferred Stock could not possibly be characterized as debt. In the *Caesar's World* case, the court found that:

Federal Reserve Board Regulation U provides that a purchaser may borrow no more than fifty percent of the funds used to purchase stock if that stock is to be pledged as security to the lender(s). Defendants' financing plan violates Regulation U because MTS Holding [the shell company acting as the purchaser] will issue debt securities to raise $475 million of the approximately $1 billion purchase price of Caesars stock, and Defendants plan to borrow just under $500 million in secured loans to raise most of the remainder of the purchase. Accordingly, nearly all of Defendants' purchase will be financed with borrowings secured by Caesars stock in violation of Regulation U.

*Caesars World, Inc. v. Sosnoff*, CV 87–1622, at 3–4 (C.D.Cal. June 8, 1987) (order granting plaintiff's motion for preliminary injunction). Defendants have argued in their briefs that they believe *Caesar's World* was wrongly decided, but have not elaborated on this position.

The issue of whether the Series B Preferred Stock is debt or equity presents rather difficult factual questions. Defendants argue that the Series B Preferred Stock conforms strictly to the features permitted for preferred stock in the Delaware Code. 8 Del.C. § 151. In our view, this is not dispositive of the characterization of the Series B Preferred Stock under the margin regulations. We note that the Series B Preferred Stock is proposed as an alternative to the Notes which Shearson Holdings would otherwise take, indicating that the acquiring entities may view the Series B Preferred Stock and the Notes as interchangeable debt instruments. Despite the designation of "Preferred Stock," there is a reasonable probability that the Series B Preferred Stock is sufficiently debt-like to represent "purpose credit" within the meaning of Regulation G, which is indirectly secured by margin stock. The cases cited by defendants are not necessarily dispositive, as they were decided outside the context of the margin regulations.

In attempting to apply the margin regulations, we are conscious of Shearson Holdings' peculiar role in this transaction, which reaches well beyond the ordinary role of a broker dealer, or even an investment banker. SL–Merger, Shearson Holdings' indirect subsidiary, holds a significant portion of the common shares of the borrower. In addition, Shearson Holdings contemplates taking Series B Preferred Stock, which defendants strenuously characterize as equity. For all defendants' protests that SL–Merger and Shearson Holdings do not con-

trol BNS Inc., the fact remains that SL–Merger has taken a significant equity position in the borrower, and Shearson Holdings may arguably take more equity if it receives the Series B Preferred Stock.

The Shearson interests appear to be somewhat stealthily pioneering the brave new world of equity financing. As the legendary camel once got its nose in the tent, intending to follow with its entire body, so Shearson seems to be pursuing an agenda of its own, which it would seemingly like to present to the financial community and regulators in finished form as a *fait accompli.* It appears unlikely that the drafters of the margin regulations contemplated that a broker dealer would take a debt/equity position such as Shearson Holdings proposes, and that this may account for the absence of specific guidance in the margin regulations.

In our view, the equity and equity-like holdings of SL–Merger and Shearson Holdings in BNS Inc. raise the distinct possibility that the Federal Reserve Board would apply an especially restrictive interpretation to the extension of credit in this case. We find it likely that the Federal Reserve Board would rely, at least in part, on Regulation G and its interpretative ruling in § 207.112 to analyze the margin obligations of a broker dealer which is acting as an investor/lender, as Shearson Holdings is doing in this instance.

We conclude that there is a reasonable probability that the $540 million Series A Preferred Stock would be indirectly secured by margin stock and, in combination with the bank syndicate's secured financing of $864 million in this $1.7 billion tender offer, the financing would violate the margin regulations of the Federal Reserve Board of Governors, a likelihood which the defendants have failed to disclose. This conclusion, of course, is narrowly based on the specific facts before us.

## VII. DISCLOSURE OF ALLEGED VIOLATIONS OF THE BANK HOLDING COMPANY ACT

Koppers alleges in Count IV of the Complaint that the transaction contemplated in the tender offer violates section 4(a)(1) of the Bank Holding Company Act ("BHCA"), 12 U.S.C. § 1843(a)(1), which prohibits a bank holding company from acquiring "direct or indirect ownership or control of any voting shares of a company which is not a bank," in that National Westminster Bank PLC ("NatWest") is a bank holding company which owns interests in the non-banking entities BNS Inc. and BNS Partners. Koppers' contends that this violation was not disclosed in the defendant's Schedule 14D–1 as required by the Williams Act.

■ As a preliminary matter, the defendants argue that Koppers lacks standing to pursue this claim. We disagree. Although Koppers may not have standing to prosecute NatWest's alleged substantive violations of the BHCA, *see Marx v. Centran Corp.*, 747 F.2d 1536, 1549 (6th Cir. 1984), *cert. denied*, 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1984), Koppers clearly has standing to pursue a claim that alleged violations of the BHCA should have been disclosed in accordance with the Williams Act. *See, e.g., Revlon, Inc. v. Pantry Pride, Inc.*, 621 F.Supp. 804, 814 (D.Del.1985).

■ The purpose of the BHCA is to separate commercial banking from commercial enterprise and thus prevent possible abuses related to the control of commercial credit. *Wilshire Oil Co. v. Board of Governors*, 668 F.2d 732, 736 (3d Cir. 1981), *cert. denied*, 457 U.S. 1132, 102 S.Ct. 2958, 73 L.Ed.2d 1349 (1982). To accomplish this purpose, the BHCA, in general, prohibits bank holding companies from acquiring control of any stock of any non-banking company and generally restricts such holding companies to banking and associated activities. 12 U.S.C. § 1843(a).

As noted, Koppers argues that NatWest has violated the BHCA by acting through a subsidiary to acquire continuing interests in the non-bank entities BNS Inc. and BNS Partners.

NatWest is an English company that is registered in the United States as a bank holding company under the BHCA. Through its wholly-owned English subsidiary Speedward, NatWest acquired a 4.9% interest in BNS Partners and .024 shares (5%) of Class B common stock and .025

shares (100%) of Class C non-voting stock in BNS Inc. Speedward was created by NatWest for the sole express purpose of participating in this transaction.

Pursuant to 12 U.S.C. § 1843(c)(6), a bank holding company may not own 5% or more of the shares of any non-banking company. Thus, a bank holding company may own up to 5% of the outstanding shares of any class of the voting securities of any company without violating the BHCA. The Federal Reserve Board has stated that the 5% exemption should apply only for "passive investments amounting to not more than 5 percent of a company's outstanding stock" and that the exemption was not intended to permit entrepreneurial activity. 12 C.F.R. § 225.137.

Koppers inartfully argues: "By acquiring 4.9 percent of BNS, NatWest is clearly attempting to circumvent the Holding Company Act by taking advantage of the Holding Company Act exemption for investments in voting securities representing less than 5% of the outstanding shares of a class of voting securities of a company." We believe Koppers' argument to be that NatWest in reality has more control over BNS Inc. and BNS Partners than its 4.9% interests seem to give it and that therefore it appears that NatWest has violated 12 U.S.C. § 1843(c)(6) and should have disclosed this fact in the Schedule 14D-1. Koppers claims that NatWest's activities are part of a concerted effort to obtain control of Koppers.

In support of its allegations, Koppers cites the following facts in an attempt to demonstrate that NatWest is more than a passive investor: (1) NatWest has committed to extend credit to Beazer in the amount of up to $300 million out of which $100 million will flow directly from NatWest to BNS Inc. to guarantee BNS Inc.'s loans from Citibank; (2) BNS Inc. has retained two NatWest subsidiaries to act as advisor and dealer-manager in the BNS Inc. tender offer; (3) a NatWest employee serves as a Beazer director; (4) NatWest has substantial shareholdings in Beazer; and (5) a NatWest subsidiary serves as financial advisor and shareholder servicer to Beazer.

The first issue that we must address is whether there even appears to be a violation of the BHCA. We find no indication of such a violation. Koppers has produced no evidence that (1) the NatWest loan to Beazer is other than an arms length lending transaction; and (2) NatWest will somehow be able to effectively increase its control in BNS Inc. or BNS Partners by acting as a dealer manager and advisor to the tender offer, by having an employee that serves as a Beazer director, or by having one of its subsidiaries serving as a financial advisor and shareholder servicer to Beazer. There is simply no evidence that NatWest or any of its subsidiaries or affiliates, directly or indirectly participates in the management, policy or affairs of BNS Inc. or BNS Partners or exercises a controlling influence over their management.

While a court might find that the amount of stock, if any, which NatWest holds in Beazer is material to this issue, Koppers has entirely failed to support this allegation. In fact, the defendants aver that this is a false statement. In light of the time constraints involved here, we refuse to peruse the 5,000 to 6,000 pages of admitted evidence in an effort to discern the validity of this unsupported allegation.

Thus, because there is no evidence that Speedward is able to control either BNS Inc. or BNS Partners beyond the extent that it is able to through its actual equity holdings, we find that it is highly improbable that Koppers would be able to prove at the trial on the merits that the Schedule 14D-1 fails to disclose possible BHCA section 1843(c)(6) violations.

## VIII. DISCLOSURE OF ALLEGEDLY UNTIMELY HART–SCOTT–RODINO NOTIFICATION VIOLATIONS

■ The Hart–Scott–Rodino Antitrust Improvements Act of 1976 ("HSR Act") prohibits any "person" from acquiring the voting securities of another person without notifying the Federal Trade Commission and the Department of Justice if:

(a)(1) the acquiring person, or the person whose voting securities or assets are being acquired, is engaged in commerce or in any activity affecting commerce;

. . . . .

(a)(2)(C) any voting securities or assets of a person with annual net sales or total assets of $100,000,000 or more are being acquired by any person with total assets or annual sales of $10,000,000 or more; and

(a)(3) as a result of such acquisition, the acquiring person would hold—

(A) 15 per centum or more of the voting securities and assets of the acquired person, or

(B) an aggregate total amount of the voting securities and assets of the acquired person in excess of $15,000,000.

15 U.S.C. § 18a(a).

The sole purpose of the HSR Act is to provide the Federal Trade Commission with the opportunity to monitor stock acquisitions for possible antitrust violations. It was designed to give "government antitrust agencies a fair and reasonable opportunity to detect and investigate large mergers of questionable legality before they are consummated." H.R.Rep. No. 1371, 94th Cong., 2d Sess. 5. Accordingly, there is no private right of action under the HSR Act. *Hammermill Paper Company v. Icahn,* Civil Action No. 80–47B–Erie (W.D.Pa. 1980).

There is no dispute that Beazer made a HSR Act filing on March 3, 1988, and that it fully disclosed this fact to Koppers' shareholders. The tender offer states: "Beazer PLC and American Express Company expect to file their [HSR Notification and Report forms] with the Antitrust Division and the FTC on March 3, 1988, and the waiting period with respect to the Offer will expire, assuming filing on March 3, 1988, and no request for additional information, at 11:59 P.M., New York City time, on March 18, 1988." Offer to Purchase, at 36.

Koppers argues that Beazer, acting through Bright and BNS Partners, violated the Williams Act by failing to disclose that it did not make a timely HSR filing. Reduced to its essence, Koppers contends that due to the amount of Beazer's holdings of Koppers stock, through Bright and BNS Partners, in January, 1988, and possibly even earlier, Beazer was required to make an HSR filing prior to March 3, 1988. Koppers argues that the March 3 filing was untimely as required by the HSR Act and that this fact should have been disclosed to Koppers' shareholders. Beazer responds that at no time prior to March 3, 1988, was it required to make a HSR filing.

We find it unnecessary to sift through the morass of stock purchase and sale records provided in the record to determine at precisely what moment Beazer and/or BNS Partners was required to make a HSR Act filing. That is a matter for the FTC and Antitrust Division.

Even assuming that the filing was untimely, we find that Koppers does not have a reasonable probability of establishing at a trial on the merits that Beazer violated the Williams Act in this fashion. It would appear that the shareholders of Koppers were adequately notified that an HSR Act filing was being made due to Beazer's purchases of Koppers stock. We do not believe that a shareholder would find it material that the HSR Act filing should possibly have been made at some earlier point in time before March 3. The material fact that a reasonable investor would consider would be that an HSR Act filing had been made by those controlling the tender offer and that the FTC and Antitrust Divisions were notified of the significant stock purchases of the filing party. Issues regarding the timeliness of a filing and the substantive review of that filing are left up to the governmental antitrust agencies. *See* 15 U.S.C. § 18a(g) (civil penalties for failure to comply with HSR filing requirements).

We find no Williams Act disclosure violation with regard to Hart–Scott–Rodino filings.

IX. DISCLOSURE OF INFORMATION REGARDING KOPPERS' ENVIRONMENTAL LIABILITIES

A. *The Arguments of the Commonwealth of Pennsylvania and the Governor of Pennsylvania as Amici Curiae*

The Commonwealth of Pennsylvania and the Governor of the Commonwealth

were granted leave to file briefs as *amici curiae.* The thrust of the Commonwealth's arguments (as do some of Koppers') expresses environmental concerns; in addition the *amici* argued that the transaction would adversely affect the economy —"jobs, communities and families" in Pennsylvania.

While these arguments for the public interest have great emotional appeal, and were well-argued by counsel for the Commonwealth and the Governor, we do not believe that those issues are relevant to the Williams Act questions before us at this time.

The Commonwealth makes an analogy to the Uniform Fraudulent Conveyances Act, 39 P.S. §§ 351–63, but we do not agree that this argument applies here. No provision of the Williams Act, so far as we can determine, speaks to environmental concerns.

## B. *The Arguments of Koppers*

█ Koppers argues that the Schedule 14D–1 filed by BNS Inc. fails to disclose Koppers' potential environmental liabilities. At the hearing, Koppers provided substantial and highly detailed evidence that (1) Koppers is and will remain indebted for enormous quantifiable and unquantifiable expenses of cleaning up and monitoring numerous hazardous substance infected work sites; (2) Koppers' Construction and Materials operations have steady earnings that are necessary to solve (and pay for) the environmental problems of the Chemical and Allied Products Systems business that Beazer has indicated its intention to sell off; and (3) Koppers' cannot sell any of its businesses from the Chemical and Allied Products operations without retaining liability for past environmental problems.

Koppers argues that the agreement that BNS Inc. has with Citibank grants Citibank the right to reject tender offer financing if it finds problems with Koppers environmental liabilities and that therefore BNS Inc. should disclose the extent of Koppers liabilities so that the shareholders may make their own reasoned analysis as to whether Citibank will continue with the financing arrangements.

There are several serious problems with Koppers' position on environmental concerns. First, Koppers cites no provision in Schedule 14D–1, no other statutory or regulatory provisions, and no case law to support its argument.

Second, we find no environmental review condition to Citibank's commitment to fund the tender offer for Koppers stock. While Citibank's financing of the proposed merger after the tender offer is contingent upon, inter alia, Citibank's receipt of a satisfactory environmental review report concerning Koppers, it is highly speculative that further disclosures about this environmental audit are relevant to the decisions to be made by Koppers' shareholders. We do not believe that a reasonable investor would find facts regarding this very contingent loan arrangement to be material in determining whether to tender his shares in Koppers.

Third, to require the tender offeror to supply such detailed information about the target company would be giving the target company the key to perpetual freedom. If the target company refused to disclose such highly private information then the tender offeror would never be able to meet its Schedule 14D–1 requirements.

Last, we are hesitant to open a Pandora's Box where one has not been provided by the SEC. (Enough exist already!) Extending Koppers' argument to its logical conclusion, the tender offeror would have to disclose to the shareholders of the target company all of the problems with their own corporation that may give a future lender of the tender offeror cause to reconsider a decision to lend.

Accordingly, we find that it is highly unlikely that Koppers could establish at the trial on the merits that BNS Inc. violated the Williams Act by failing to disclose Koppers extensive environmental liabilities.

## X. DEFENDANTS' COUNTERCLAIMS ALLEGING VIOLATIONS OF THE WILLIAMS ACT BY PLAINTIFF

█ The defendants have filed a counterclaim against Koppers alleging that the Schedule 14D–9 filed by Koppers in re-

sponse to the tender offer is materially false and misleading and is therefore in violation of the Williams Act. The defendants seek an order dismissing Koppers' Complaint and a preliminary and permanent injunction ordering Koppers to correct its Schedule 14D–9 to comply with the Williams Act.

In light of our above analysis, in sum finding that it is highly likely that Koppers can establish at a trial on the merits that the defendants violated the Williams Act in several respects, it appears that the defendant's tender offer is invalid under the federal securities laws. Accordingly, we find it unnecessary to address the contentions in defendants' counterclaim. Until such time as a valid tender offer is made, Koppers is not obligated to file a Schedule 14D–9.

We will therefore (1) deny the defendants' motion to dismiss Koppers' Complaint, and (2) deny without prejudice defendant's request for a preliminary injunction.

## XI. CONCLUSION

On the basis of the foregoing analysis, we conclude that Koppers has a reasonable probability of proving at the trial on the merits that the tender offer, as proffered, would violate Sections 14(d) and (e) of the Williams Act in the following respects:

1. There is no Schedule 14D–1 filed on behalf of the Shearson Interest bidders.

2. The tender offer fails adequately to disclose how the bidders intend to discharge debts incurred as a result of the tender offer, and in particular to redeem the Shearson Interests.

3. The tender offer fails to disclose adequately possible violations of the margin requirements of the Securities and Exchange Act and regulations promulgated by the Federal Reserve Board.

Furthermore, unless immediately enjoined, the apparent violations of the Williams Act will result in immediate injury which cannot be adequately remedied in an action for damages. Once consummated, a tender offer cannot be unscrambled even if it is subsequently found to be invalid under the federal securities laws. This is especially true in this case since the defendants have indicated their intention to sell Koppers' Chemicals and Allied Products business, and probably other assets, should the tender offer be successful.

When weighing the potential harms to the parties as the result of an injunction prohibiting the tender offer from being completed, we find that the possible prejudice to the defendants in issuing this order is less than the potential prejudice to Koppers and its shareholders should the injunction not be granted. Since we have determined that there is a great probability that the defendants have violated the Williams Act, we can perceive no justification for allowing the tender offer to be completed until a trial on the merits can be held or until such time as the various defendants have taken corrective steps consistent with this Opinion.

Any delay in the commencement of the tender offer is directly attributable to the defendants' failure to follow the disclosure requirements of the Williams Act. The prejudice to the defendants is certainly less than the injury that Koppers and its shareholders might experience if they are forced to make decisions regarding a tender offer which likely violates the Williams Act.

Last, we find that the public interest will best be served by the issuance of a preliminary injunction. The potential ramifications of this tender offer to the Pittsburgh community are uncertain and possibly adverse.

Accordingly, the interests of justice will be best served by preserving the status quo and granting Koppers' motion for a preliminary injunction. Until a trial on the merits shall be held, the defendants will be restrained from (1) soliciting the tender of any Koppers stock, (2) acquiring or attempting to acquire any shares of Koppers stock, and (3) voting any shares of Koppers stock previously acquired, or using such

shares to control or affect the management of Koppers.

Because of the foregoing, the defendants' Motion for Dismissal will be denied, and defendants' request for a preliminary injunction will be denied without prejudice.

An appropriate order will issue.

## ORDER

AND NOW, to-wit, this 15th day of April, 1988, for the reasons set forth in the foregoing Opinion, it is hereby ORDERED, ADJUDGED, and DECREED that plaintiff's Motion for Preliminary Injunction be and hereby is GRANTED. Accordingly, it is further ORDERED that the defendants and each of them, their agents, servants, employees, and all persons acting on their behalf or in concert with them, are during the pendency of this action and until a trial on the merits shall have been had, enjoined and restrained from:

(a) soliciting the tender of any shares of Koppers stock;

(b) acquiring or attempting to acquire in any manner any shares of Koppers' stock; and

(c) voting any shares of Koppers stock previously acquired, or otherwise using any share of Koppers' stock previously acquired, as a means of controlling or affecting the management of Koppers.

It is further ORDERED that defendant's Motion for Dismissal be and hereby is DENIED, and defendants' request for a preliminary injunction be and hereby is DENIED without prejudice.